**2023 IL 127241**

# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

_____

(Docket No. 127241)

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant,
v. JOHN PRANTE, Appellee.

*Opinion filed May 18, 2023.*


JUSTICE CUNNINGHAM delivered the judgment of the court, with opinion.

Chief Justice Theis and Justices Neville, Overstreet, and Holder White concurred in the judgment and opinion.

Justices Rochford and O'Brien took no part in the decision.


**OPINION**

¶ 1 Petitioner John Prante filed a motion in the circuit court of Madison County seeking leave to file a successive postconviction petition challenging his conviction for murder. In his motion and accompanying petition, Prante asserted that recent scientific studies had fully discredited forensic bite mark opinion testimony that was introduced by the State at trial. Prante raised a claim of actual innocence, a

separate due process claim, and three additional claims. The circuit court denied Prante leave to file all claims.

¶ 2    On appeal, the appellate court reversed the judgment of the circuit court denying Prante leave to file his due process claim and affirmed the judgment of the circuit court denying Prante leave to file his claim of actual innocence. The appellate court did not address Prante's remaining claims. 2021 IL App (5th) 200074. For the reasons that follow, we reverse the judgment of the appellate court allowing Prante to file his due process claim and affirm the judgment of the appellate court denying Prante leave to file his claim of actual innocence. We remand the cause to the appellate court to address Prante's remaining claims.

¶ 3                                    BACKGROUND

¶ 4    Following a jury trial in the summer of 1983, Prante was found guilty of the murder of 22-year-old Karla Brown. Evidence at trial established the following.

¶ 5    On June 20, 1978, Brown and her fiancé, Mark Fair, spent the day moving into their newly purchased home in Wood River, Illinois. Friends of the couple helped with the move and stayed into the evening for dinner and drinks.

¶ 6    That same day, Prante and his friend, John Scroggins, were next door at the home of Paul Main, drinking and partying. At trial, Scroggins testified that he saw Brown, whom he knew from school, and said hello to her outside the house. He also introduced her to Prante. The three spoke briefly, and Scroggins and Prante then returned to Main's house. Thereafter, according to Scroggins, Prante began talking about Brown, telling Scroggins "how good" she looked and how he was particularly interested in her "chest." Scroggins stated that Prante showed "more interest" in Brown than he had with other women, seemed to be excited about her, and kept bringing the conversation back to her. When Prante drove Scroggins home later that evening, he again talked about Brown. Prante was also "upset" and "irritated" that he could not join the gathering of friends at Brown's house.

¶ 7    The next morning, on June 21, 1978, Fair went to work, leaving Brown home alone. Sometime between 10 and 11 a.m., Brown spoke with Fair's mother on the phone. The conversation ended when Brown said that someone was at the door.

¶ 8    At approximately 10:45 a.m., Edna Moses was driving with her six-year-old grandson, Eric Moses, on the street where Brown lived. Realizing that she was heading in the wrong direction, Edna pulled into the driveway of Brown's house to turn around. As she did so, she saw a man and a woman standing near the garage, talking. The woman, who matched Brown's description, turned and walked toward the house with the man following after her. Eric testified that he also saw the man and woman. He stated that the woman was wearing a short-sleeved shirt with flowers on it and that she "sort of got mad at" the man.

¶ 9    At approximately 11 a.m., Brown's friend Debbie Davis stopped by Brown's house to visit. She knocked on the front and back doors but left when there was no answer. She did not see anyone on the porch next door. Between noon and 2:30 p.m., Davis and two other friends phoned Brown's home but, again, got no answer.

¶ 10   Fair returned home from work at approximately 5 p.m. with his friend Tom Fiegenbaum. Fair went into the house, calling for Brown. He made his way to the basement, where he saw the room in disarray and blood "all over" the floor and couch. As he was turning to run back upstairs, he glanced into the basement laundry room and saw Brown's body.

¶ 11   Brown was bent over at the waist, with her head and shoulders inside a metal barrel. The barrel, which had been used to store clothes, was filled with water. Brown's hands were tied behind her back with a white extension cord, and two men's socks were tied around her neck. She was wearing a heavy sweater that she normally wore only in the winter and was naked from the waist down. She also had large cuts on her forehead and chin. Fair immediately lifted Brown's body out of the barrel and laid her on the floor. Fiegenbaum called the police, who arrived within a few minutes.

¶ 12   Wood River police chief Ralph Skinner testified that he arrived at Brown and Fair's home at approximately 6 p.m. He stated that the area was secured and that no civilians were allowed in the home while the crime was being investigated.

¶ 13   Wood River police detective Charles Nonn arrived at the crime scene about 20 minutes after Chief Skinner. He stated that he saw two men, whom he identified as Prante and Main, standing in Main's front yard.

¶ 14    Police investigating the crime scene found blood splattered on the basement floor and a bloodied couch cushion heavily saturated with water. A blood-stained tampon was found on a coffee table near the couch, and a stand of TV trays was overturned. A coffee pot from a coffee maker kept in the kitchen was found in the rafters of the laundry room. A fingerprint was recovered from the coffee pot, but it did not match Prante's prints or anyone else whose prints were submitted for comparison.

¶ 15    Dr. Harry Parks performed an autopsy on Brown. At trial, he testified that she had suffered a fractured jaw, several bruises, and severe scraping around her throat that he believed was consistent with strangulation. She also had lacerations on her forehead, nose, and chin that were caused by a blunt object. Dr. Parks concluded that the cause of Brown's death was strangulation and that the time of death was approximately 11:45 a.m., although that time could have varied by several hours.

¶ 16    Prante was interviewed by Wood River police chief Skinner on June 24, 1978. During this interview, Prante told Chief Skinner that he and Scroggins were at Main's house the day before the murder. They saw Brown and Fair moving in with the help of several other people and then having a party. According to Prante, Scroggins said that he knew Brown and that they ought to go over to the party, but they never did.

¶ 17    Prante also told Chief Skinner that the next morning, around 8:30 a.m., he went to Main's house to see if Main wanted to go to St. Louis to drop off some job applications. Main could not go, however, because he had a job painting a house, so Prante went by himself. Prante told Chief Skinner that, after dropping off the job applications, he "bummed around or stopped by somewhere." Prante said that he did not see Main again until approximately 6 p.m. at the home of his friend Harold Pollard. While there, Main told Prante that Brown had been killed.

¶ 18    On July 5, 1978, Prante was interviewed by Wood River police detective Eldon McEuen. During this interview, Prante again confirmed that he had been at Main's house the day before the murder and had watched the party next door. Prante told Detective McEuen that he was "very much aware of this young lady that lived there" and that "he felt she was beautiful." Prante stated that he had wanted to join the party, but he had not been invited.

- 4 -

¶ 19    Prante also told Detective McEuen that the next morning he went to Main's house to see if Main wanted to drop off job applications. However, Main was busy painting a house, so Prante went alone. When Detective McEuen asked Prante if he had returned to Main's house after that, Prante said "he wasn't sure if he did or didn't."

¶ 20    Main's aunt, Edna Vancil, lived across the street from Main. At trial, she testified that she saw Prante, whom she had known for eight or nine years, arrive at Main's house between 9:30 and 10 a.m. on the day of the murder. She stated that Main had been painting a house but joined Prante on Main's front porch. According to Ms. Vancil, the two sat on the porch, "smoking pot and drinking beer" and then "disappeared from eleven o'clock until almost twelve o'clock." They then returned to the porch and stayed there until approximately 3 p.m. when Prante left. Ms. Vancil spoke to police on the night of the murder, but she was not asked any questions about Prante at that time.

¶ 21    Two years after the murder, in the summer of 1980, Wood River police investigators sent photographs of Brown's body that had been taken at the crime scene and during the autopsy to Dr. Homer Campbell, a forensic dentist and expert in image enhancement. The photographs were black and white and were unscaled, meaning that there was no ruler or other measuring standard placed next to the body to establish the size of any wounds. After reviewing the photographs, Dr. Campbell informed the police that there were bite marks on Brown's right collarbone. Prior to this, no police officer or other official had been aware of the possible existence of bite marks on Brown's body.

¶ 22    Nearly two years later, in March 1982, police investigators decided to exhume Brown's body and conduct a second autopsy. As part of an intentional media campaign, police notified reporters about the exhumation, told them about the purported bite marks on Brown's collarbone, and indicated that they were nearing an arrest.

¶ 23    Brown's body was exhumed on June 1, 1982, and a second autopsy was performed by Dr. Mary Case. Her findings largely confirmed those of the first autopsy, although she opined that drowning was the cause of death rather than strangulation. Dr. Case also examined the wounds on Brown's collarbone, which

had been identified as bite marks, and testified that the injuries occurred at or near the time of death.

¶ 24    Following the exhumation of Brown's body and the accompanying publicity, four friends of Prante's—Vicki White, Mark White, Spencer Bond, and Roxanne Bond—came forward with information for the police. All four testified at trial.

¶ 25    Vicki White testified that within three days of the murder she and Mark White, her then-husband, were at the home of Spencer Bond and his wife Roxanne. According to Vicki, Prante entered the house and began talking about Brown. Prante stated that Brown "was murdered and that her body was down in her basement, and she was in a curled up position, and she had teeth marks on her body." Vicki testified that, when Prante mentioned the teeth marks, he made a gesture by putting "his arm over his shoulder." Vicki also stated that Prante was "nervous" and that he told the group that he was at Brown's house on the day of the murder but that Brown was "all right" when he left. Prante also told them that "he had to get his story straight and he had to get out of town because the police were looking for him."

¶ 26    Mark White also testified that, within a few days of the murder, he and Vicki were at the home of Spencer and Roxanne Bond when Prante arrived. Prante was "nervous" and acting "strange" and brought up the subject of Brown's murder. Prante told the group that he knew Brown and had been over to her house on the day of the murder and was supposed to return there that evening. Although Prante did not say why he was at Brown's house, Mark testified that he had a "feeling" that "it was probably to go over there to have sex with her." Mark stated that while Prante was talking to Spencer, Prante "made a gesture of putting his hand up to his shoulder," although he did not hear what Prante said. Mark also stated that Prante told the group he was going to be questioned by the police about Brown's murder and that he was afraid that "he could have been the last one to see her alive."

¶ 27    Spencer Bond similarly testified that Prante came to his house and discussed the murder a few days after it happened. According to Spencer, Prante was "a little agitated" and "more nervous" than usual and said that he and Main "had to get their stories together as to what they were doing that day" "so the police wouldn't be able to crack his alibi." Prante stated that he was at Main's house the day of the murder. Main had been painting a house next door and then joined Prante in

"getting drunk and getting high." Prante said that he talked to Brown at about 2 or 3 p.m. and that he "was supposed to go back and see her because he might have a possible date with her." Prante also said that "the girl was in a curled position stuck in a pail of water down in the basement," "had teeth marks on her shoulder where she had been bitten," and "had been tied up."

¶ 28    Roxanne Bond also testified that Prante was at her house with Spencer, Mark, and Vicki. However, Roxanne stated that she did not hear any of the group's conversation because she was busy taking care of her daughter. Roxanne did recall Prante saying on one occasion that "he had to get his story straight," but she could not remember when he said it.

¶ 29    After speaking with police investigators, Spencer had two conversations with Prante while secretly wearing a recording device. In these conversations, Prante acknowledged that, on the day of the murder, he was on Main's front porch from 10 or 11 a.m. until evening and that he saw Brown "putterin' around outside." He also said that he may have spoken with Brown on the "walkway" but did not go into her house. Prante further stated that, after the police arrived, Brown's house was sealed off and no one could have gotten inside. Prante also told Spencer that he was "not guilty of anything," did not "remember the bite marks," and "didn't know nothin' about it."

¶ 30    Harold Pollard, who had known Prante for approximately 11 years, also testified at trial. Pollard stated that, on the day of the murder, Prante came to his house at approximately 6:30 or 7 p.m. Prante seemed "agitated" and "anxious" and asked Pollard if he "had any tranquilizers that he could use." Prante told Pollard that he had just come from Main's house where he had been "smoking pot and drinking beer" and that the girl next door had been murdered or killed. Prante said that Brown's "body was found curled up on the floor with its hands tied behind its back." When Pollard asked Prante how he knew this, Prante said "he got a glimpse of the girl by looking over the policeman's shoulder at the crime scene" inside the house. According to Pollard, Main came to his house sometime after Prante arrived, and the two exchanged comments about the murder. Pollard also testified that, a day or two earlier, Prante had told Pollard that Brown was "a really nice looking girl" and "he wouldn't mind, you know, having relations with her."

¶ 31        Susan Lutz, who had previously had a sexual relationship with Prante, also testified. Ms. Lutz stated that on a couple of occasions Prante bit her on the neck during sex. She also stated that Prante once whispered in her ear after having sex that "he had killed a woman." When Ms. Lutz asked why he had killed the woman, Prante said "he was mad" but offered no other explanation, stating that he could not talk about it because he would "lose [his] freedom."

¶ 32        The State offered the testimony of two forensic dentists, Dr. Campbell and Dr. Lowell Levine. Dr. Campbell testified that bite mark analysis had improved in recent years and had gained wide acceptance among pathologists. He explained that "[e]verybody's dentition is individual" and compared dental impressions to fingerprints. He further stated that human skin was a "very excellent" medium for bite marks and an "excellent reproducer of tooth characteristics."

¶ 33        Dr. Campbell testified that the autopsy photographs of Brown "definitely" showed at least three overlapping human bite marks on her right collarbone. Dr. Campbell compared the bite marks in the photographs to the dental impressions of Prante, Main, and two other individuals. According to Dr. Campbell, Prante's teeth were "consistent with" the bite marks, meaning that his "teeth could have made the bite marks, period." The teeth of the other individuals, however, could not. Dr. Campbell acknowledged that the autopsy photographs were black and white rather than color and were unscaled. Nevertheless, Dr. Campbell stated there was nothing about the quality of the photographs or the process by which they were taken that altered his opinion that the bite marks were consistent with Prante's teeth.

¶ 34        Like Dr. Campbell, Dr. Levine similarly compared bite mark analysis to fingerprint analysis, stating that bite mark analysis "really is no different than a fingerprint person looking at the characteristics left by a bloody handprint on a wall" and that different persons cannot leave identical bite marks. He further stated that human "skin can capture the unique and individual characteristics of the teeth with *** excellent fidelity." Dr. Levine testified that there were bite marks shown in the autopsy photographs. He stated that Prante's teeth "could have caused that injury pattern" and further that, if only the teeth of Main and Prante were considered, he "would have to say [the bite marks] had to be left by Mr. Prante."

¶ 35    The State also called Prante's own dentist, Dr. Ronald Mullen, to testify. He stated that he saw 6000 to 7000 patients a year and that the spacing in Prante's teeth was very unique, so much so that less than 1% of his patients had teeth like that.

¶ 36    Dr. Edward Pavlik, a forensic odontologist, testified on Prante's behalf. Dr. Pavlik stated that there were several problems with the autopsy photographs that purportedly showed bite marks: the photographs were not taken at the correct angle, there was no scale present for purposes of comparison, and the pathologist appeared to be pulling on the skin in one photograph, thereby causing distortion. Dr. Pavlik stated that the photographs were "one step above useless" and there was "very little evidence *** to even substantiate that we have a bite mark." When asked to assume that the injury in the photographs was a bite mark, Dr. Pavlik stated that Prante's teeth were consistent with the mark but that as much as 10% of the adult population had spacing of their teeth similar to Prante's.

¶ 37    A second forensic odontologist, Dr. Norman Sperber, also testified that the autopsy photographs were not "suitable" for making bite mark comparisons and that, given their poor quality, he had "no way of knowing" what he was looking at. Dr. Sperber stated that the injuries in the photographs "resembled other things" as well as bite marks and he was "not sure that there are any bite marks shown." Dr. Sperber also stated that attempting to identify a bite mark from such poor-quality photographs would be akin to "witchcraft or opinion." When asked to assume that the injuries were bite marks, Sperber stated that, at most, it was "possible" Prante's teeth made them.

¶ 38    Prante testified on his own behalf. Prante stated he had "virtually no memory" of the day of the murder but that his memory had "improved over the last year" when he started reading the discovery in the case and "things started clicking back into place." He acknowledged that he and Scroggins were at Main's house the evening before the murder and that Scroggins had gone over and talked to Brown. Prante denied, however, that Scroggins had introduced Brown to him.

¶ 39    Prante stated that, on the day of the murder, he went to Main's house around 8 or 8:30 a.m. and then left to drop off some job applications. He returned to Main's house sometime between 10 a.m. and 1 p.m. and then "sat around" on the front porch and "probably got high again." When asked how long he stayed on the porch, Prante stated, "I keep having this feeling that I was there all day; that I stayed the

entire day; that it just keeps coming to mind." He also stated that he may have left the porch at one point to see the house that Main was painting and may have gone to the store.

¶ 40    Prante acknowledged seeing Brown on the day of the murder. According to Prante, she was "out in the front yard puttering around" sometime in the morning or early afternoon and was wearing "white shorts and like a white flowered top."

¶ 41    Prante testified that he remembered being on the front porch when police arrived following the murder and then going inside Main's house with Main. He stated that he left Main's house in the early evening and then went to Pollard's house. He further stated that he first learned of the murder when Main told him about it at Pollard's house.

¶ 42    Prante acknowledged that, when he was first interviewed by Chief Skinner, he told him that on the day of the murder he did not return to Main's house after dropping off the job applications. Prante explained that he must have made this statement due to a "memory problem" or "confusion." Prante denied making the statements attributed to him by Pollard, Lutz, Spencer Bond, and Mark and Vicki White and denied ever biting Lutz. He also denied killing Brown.

¶ 43    Following arguments, the jury found Prante guilty of murdering Brown. He was subsequently sentenced to 75 years' imprisonment.

¶ 44    On direct appeal, the appellate court rejected Prante's claim that the State's expert testimony concerning the bite marks should not have been admitted. *People v. Prante*, 147 Ill. App. 3d 1039, 1062 (1986). The court held that Prante had waived the issue and, in the alternative, that the trial court did not abuse its discretion in "allowing expert testimony concerning bite marks to aid comparison between the wounds on the victim's right shoulder and the dentition of the defendant." *Id.*

¶ 45    In 1993, Prante filed a postconviction petition in which he raised a claim of ineffective assistance of counsel and a due process claim based on "material misrepresentation of evidence relating to evidence of blood found at the crime scene." The circuit court dismissed the petition as untimely, and the appellate court affirmed the dismissal. *People v. Prante*, 275 Ill. App. 3d 1153 (1995) (table) (unpublished order under Illinois Supreme Court Rule 23).

¶ 46 In 2002, Prante filed a petition for relief from judgment in which he contended that his sentence violated *Apprendi v. New Jersey*, 530 U.S. 466 (2000). The circuit court dismissed the petition, and the appellate court affirmed the dismissal. *People v. Prante*, 369 Ill. App. 3d 1066 (2006) (table) (unpublished order under Illinois Supreme Court Rule 23).

¶ 47 In 2017, Prante filed a motion for DNA and fingerprint testing pursuant to section 116-3 of the Code of Criminal Procedure of 1963 (725 ILCS 5/116-3 (West 2016)). He sought testing of several items of physical evidence as well as analysis of the fingerprint found on the coffeepot discovered in the laundry room rafters. The circuit court entered agreed orders for the testing. No interpretable DNA profiles were obtained, and no match was found for the fingerprint.

¶ 48 In 2018—35 years after he was convicted—Prante filed the motion seeking leave to file the successive postconviction petition that is at issue in this appeal. In his petition, Prante raised five claims: (1) a claim of actual innocence pursuant to *People v. Washington*, 171 Ill. 2d 475 (1996); (2) a separate due process claim alleging that his trial proceedings were rendered fundamentally unfair by the admission of bite mark analysis evidence; (3) ineffective assistance of trial counsel; (4) ineffective assistance of appellate counsel; and (5) cumulative error.

¶ 49 Prante attached to his petition two affidavits from Dr. Iain Pretty, an expert in forensic odontology. In these affidavits, Dr. Pretty averred that at the time of Prante's trial "the use of bitemark evidence was a well-accepted forensic technique, generally understood by its practitioners and by the scientific community to be valid and reliable." However, since the time of Prante's trial, that understanding has "shifted significantly" as a result of new research and scientific review. In light of this new research, Dr. Pretty stated there is no "evidence to support the fact that forensic dentists can even agree on what a bitemark *is*—never mind the more advanced proposal that this pattern may actually be linked to someone." (Emphasis in original.) Further, according to Dr. Pretty, "even board-certified forensic dentists cannot reliably answer the threshold inquiry in bitemark analysis: whether the injury at issue is or is not a bitemark." Dr. Pretty stated that the conclusions "drawn by the forensic dentists in [this] case, even at the level of identifying these injuries as human bitemarks, would not be supported [by the scientific community] today."

¶ 50    Prante also appended three reports on bite mark analysis to his petition, all of which were referenced by Dr. Pretty: a 2009 report of the National Academy of Sciences (Nat'l Acad. of Sci., *Strengthening Forensic Science in the United States: A Path Forward* (2009), https://www.ojp.gov/pdffiles1/nij/grants/228091.pdf [https://perma.cc/J2NU-CYYM]), a 2016 report from the President's Council of Advisors on Science and Technology (President's Council of Advisors on Sci. and Tech., *Forensic Science in Criminal Courts: Ensuring Scientific Validity of Feature-Comparison Methods* (2016), https://obamawhitehouse.archives.gov/ sites/default/files/microsites/ostp/PCAST/pcast_forensic_science_report_final.pdf [https://perma.cc/5KTD-C4DF]), and a 2016 report from the Texas Forensic Science Commission (Tex. Forensic Sci. Comm'n, *Forensic Bitemark Comparison Complaint Filed by National Innocence Project on Behalf of Steven Mark Chaney— Final Report* (2016), https://www.txcourts.gov/media/1454500/finalbitemark report.pdf [https://perma.cc/EGX5-V6JW]).

¶ 51    These three reports were uniform in concluding that bite mark analysis is not scientifically valid. According to these reports, it has not been scientifically established that human bite marks are unique or that human skin can record those marks with accuracy and permanency. Further, there is no scientific basis for identifying one individual to the exclusion of all others based on bite mark analysis and no basis for stating that a particular injury can be associated with an individual's dental impressions.

¶ 52    Prante also attached to his petition an affidavit from Dr. Nancy Franklin, a professor of psychology who studies cognition and false memories. Dr. Franklin discussed limitations and biases that may affect human memory and averred that these limitations likely affected the ability of several witnesses to accurately recall the details of their conversations with Prante.

¶ 53    The circuit court denied Prante leave to file all claims. On appeal, the appellate court reversed the judgment of the circuit court with respect to Prante's due process claim. 2021 IL App (5th) 200074. Addressing that claim, the appellate court focused on whether bite mark analysis is "scientific evidence" that must satisfy the general acceptance test of *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), to be admitted at trial. 2021 IL App (5th) 200074, ¶¶ 63-87. The appellate court concluded that bite mark analysis is scientific evidence within the meaning of *Frye*

but that no Illinois court had ever subjected bite mark analysis to the *Frye* test. *Id.* ¶ 77. The appellate court also concluded that Prante had made a *prima facie* showing of cause and prejudice and, therefore, that "the circuit court erred in denying the petitioner leave to file his successive postconviction petition on this basis." *Id.* ¶ 87. The appellate court then affirmed the judgment of the circuit court denying Prante leave to file his claim of actual innocence (*id.* ¶¶ 89-97) but did not address Prante's remaining claims.

¶ 54 We allowed the State's petition for leave to appeal. Ill. S. Ct. R. 315 (eff. Oct. 1, 2020). Prante has requested cross-relief from the appellate court's judgment denying him leave to file his claim of actual innocence. Ill. S. Ct. R. 318(a) (eff. Oct. 1, 2020).

¶ 55 ANALYSIS

¶ 56 At the outset, we take judicial notice of the fact that Prante, who was sentenced in 1983 under the day-for-day, good-time credit scheme (Ill. Rev. Stat. 1981, ch. 38, par. 1003-6-3(a)(2)), has now fully served his sentence, including any period of parole or mandatory supervised release. However, this fact does not affect our disposition of this appeal.

¶ 57 Section 122-1(a) of the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1(a) (West 2016)) requires that the petitioner be imprisoned at the time the postconviction proceedings are "instituted." Here, there is no dispute that Prante was imprisoned when he filed his motion for leave to file his successive postconviction petition in 2018. The Act's imprisonment requirement was therefore satisfied. See *People v. Coe*, 2018 IL App (4th) 170359, ¶ 43 ("current imprisonment is a condition for '*institut[ing]*' a postconviction proceeding, not for continuing to litigate it" (emphasis in original)). In addition, Prante's interest " 'in purging [himself] of the stigma and disabilities which attend a criminal conviction' " prevents his case from being moot. *Id.* ¶ 50 (quoting *People v. Davis*, 39 Ill. 2d 325, 329 (1968)). Accordingly, although Prante is no longer serving any sentence, we are not precluded from addressing the matters raised in this appeal.

¶ 58 At issue here is the circuit court's denial of Prante's motion for leave to file a successive postconviction petition under the Act (725 ILCS 5/122-1 *et seq.* (West

2016)). The Act provides the statutory means for a criminal defendant to assert that "in the proceedings which resulted in his or her conviction there was a substantial denial of his or her rights under the Constitution of the United States or of the State of Illinois or both." *Id.* § 122-1(a)(1). "The Act is not a substitute for an appeal, but rather, is a collateral attack on a final judgment." *People v. Edwards*, 2012 IL 111711, ¶ 21.

¶ 59        Both the Act and our caselaw make clear that the filing of only one postconviction petition is contemplated. 725 ILCS 5/122-3 (West 2016) ("Any claim of substantial denial of constitutional rights not raised in the original or an amended petition is waived."); *People v. Robinson*, 2020 IL 123849, ¶ 42. However, there are two exceptions to the bar against successive proceedings. The first is the "cause and prejudice" exception, which has been codified in the Act. See 725 ILCS 5/122-1(f) (West 2016). The second, the "fundamental miscarriage of justice" exception, requires a petitioner to make a persuasive showing of "actual innocence." *People v. Taliani*, 2021 IL 125891, ¶ 55. Under either exception, a petitioner seeking to file a successive postconviction petition must first obtain leave of court. *Id.* ¶ 58. A circuit court's denial of a petitioner's motion for leave to file a successive petition is subject to *de novo* review. *Id.* ¶ 52.

¶ 60                                    Due Process Claim

¶ 61        In his postconviction petition, Prante raises a due process claim in which he alleges that the admission of bite mark analysis evidence rendered his trial fundamentally unfair. Prante contends (and the State agrees) that, for purposes of deciding whether he should be granted leave to file this claim, we must take as true the conclusions reached in the materials attached to Prante's postconviction petition. This means that we must assume that bite mark analysis, *i.e.*, expert opinion testimony comparing an injury on human skin to the dental impressions of another person, has been thoroughly discredited. Prante asserts that the "admission of scientific evidence now found to be invalidated and unreliable" means that he was convicted "in violation of due process" and is therefore entitled to a new trial. Prante further asserts that he has satisfied the cause and prejudice test and, therefore, should be permitted to go forward with this claim.

- 14 -

¶ 62    The circuit court denied Prante leave to file his due process claim, but the appellate court reversed the circuit court's ruling. In doing so, however, the appellate court did not adopt Prante's characterization of the claim. Rather than applying a due process analysis, the appellate court engaged in an extensive discussion of the *Frye* general acceptance test that is used when considering the evidentiary admission of new scientific principles or methodologies. 2021 IL App (5th) 200074, ¶¶ 63-87. The appellate court determined that bite mark analysis is subject to the *Frye* test and noted that no Illinois court has ever held a *Frye* hearing for bite mark analysis. In addition, the appellate court's analysis and ruling appeared to require the circuit court to conduct a *Frye* hearing on remand to that court. *Id.* ¶ 95 (noting that "it remains to be determined how the *Frye* analysis will determine the scope, if at all, of the admission of comparison testimony"). The appellate court concluded its discussion by stating:

> "Since [Prante's] trial, the law regarding the admissibility of scientific evidence has developed, to the extent that bite mark evidence would now be considered 'scientific' evidence that must withstand a *Frye* analysis. Furthermore, the petition effectively alleges, and supports with documentation, a recent change within the scientific community regarding the validity and reliability of bite mark evidence, suggesting that the evidence presented by the State at [Prante's] trial is no longer generally accepted within the scientific community. We find that the petition made a *prima facie* showing of cause and prejudice and that the circuit court erred in denying the petitioner leave to file his successive postconviction petition on this basis." *Id.* ¶ 87.

¶ 63    From this, it appears the appellate court determined that Prante's due process claim required an examination of the *Frye* test and that the trial court's failure to hold a *Frye* hearing before admitting the bite mark evidence was a constitutional violation. This was error by the appellate court.

¶ 64    Relief under the Act is limited to constitutional violations that occurred at trial. *People v. Coleman*, 183 Ill. 2d 366, 380 (1998). The *Frye* test is a common-law evidentiary rule, adopted by this court and codified in the Illinois Rules of Evidence. See Ill. R. Evid. 702 (eff. Jan. 1, 2011). The *Frye* test is not a constitutional rule, and the failure to comply with *Frye* is not, in itself, a constitutional violation. *Milone v. Camp*, 22 F.3d 693, 702 (7th Cir. 1994).

- 15 -

Accordingly, Prante's due process claim cannot go forward on the grounds offered by the appellate court.[1]

¶ 65    Prante contends that, even if the appellate court erred by focusing its analysis on *Frye*, he has nevertheless set forth a cognizable constitutional violation by alleging that the admission of bite mark analysis evidence violated his right to due process. He maintains, therefore, that he should be permitted to proceed with this claim.

¶ 66    Both the federal and state constitutions protect against "conviction based on evidence of questionable reliability." *Perry v. New Hampshire*, 565 U.S. 228, 237 (2012). Ordinarily, though, this protection is provided not by the due process clause but by other constitutional guarantees, such as the right to counsel and the right to confrontation, as well as various other nonconstitutional evidentiary rules. *Id.* However, when evidence " 'is so extremely unfair that its admission violates fundamental conceptions of justice,' " the due process clause prohibits its use. *Id.* (quoting *Dowling v. United States*, 493 U.S. 342, 352 (1990)); see also, *e.g.*, *United States v. Sanders*, 708 F.3d 976, 983 (7th Cir. 2013) ("when evidence is so extremely unfair that its admission violates fundamental conceptions of justice, due process, like the sleeping giant, awakens" (internal quotation marks omitted)); *People v. Cornille*, 95 Ill. 2d 497, 508-09 (1983).

¶ 67    In this case, Prante acknowledges that he was permitted to fully cross-examine the State's forensic dental experts, Drs. Campbell and Levine, regarding their conclusions that bite marks found on Brown's body were consistent with Prante's teeth, and he was able to present his own expert witnesses to challenge those conclusions. Prante asserts, however, that his trial was nevertheless unfair because we now know that bite mark analysis is not a proper subject for expert testimony and that the testimony of Drs. Campbell and Levine was, in fact, false. As Prante explains, in light of recent scientific developments, we now know that, when Drs. Campbell and Levine each stated that bite mark analysis is the equivalent of fingerprint analysis, those statements were not true. Similarly, their statements, that

---

[1]Confusingly, the appellate court at times also referred to Prante's due process claim as "the petitioner's cause and prejudice claim." 2021 IL App (5th) 200074, ¶ 97. The cause and prejudice test is the analytical tool used to determine whether a procedurally defaulted constitutional claim may be considered on its merits. The cause and prejudice test is not the underlying claim itself.

human skin is an excellent medium for recording bite marks and that every individual's dentition is unique, also were not true. According to Prante, "[e]veryone in the courtroom—from the State, the defense, the jury and the judge—were operating under a false premise: bite mark evidence was valid and reliable 'scientific' evidence. It was not." Prante further asserts that the false bite mark testimony was emphasized by the State throughout the trial and, in this way, rendered the proceedings fundamentally unfair. Accordingly, Prante contends that he has pled a cognizable due process claim. We disagree.

¶ 68     Prante's due process claim is foreclosed by this court's decision in *People v. Brown*, 169 Ill. 2d 94 (1995). In *Brown*, the defendant filed a postconviction petition alleging that he was denied his constitutional right to a fair trial because his convictions were based on the false testimony of one of the State's witnesses. *Id.* at 95-96. The circuit court summarily dismissed the petition, and this court affirmed the dismissal. *Id.* at 96. In so doing, this court noted that both Illinois courts and the federal circuit courts were divided over whether a criminal defendant must show that the government's use of false testimony was *knowing* in order to establish a constitutional violation. *Id.* at 103-06. After acknowledging this split of authority, this court stated:

> "[W]e find that the better rule is the one expressed in those cases requiring an allegation of knowing use of false testimony in order to establish a constitutional violation. In the absence of an allegation of the knowing use of false testimony, or at least some lack of diligence on the part of the State, there has been no involvement by the State in the false testimony to establish a violation of due process. (See *Cornille*, 95 Ill. 2d at 513.) Without such involvement, the action of a witness falsely testifying is an action of a private individual for which there is no remedy under the due process clause." *Id.* at 106.

¶ 69     Under *Brown*, a defendant must allege that the State's use of false testimony was knowing in order to establish a constitutional violation. In this case, Prante has not done so. There are no allegations in Prante's motion or postconviction petition that the State knew or should have known that the testimony of Drs. Campbell and Levine was false. To the contrary, Prante acknowledges that at the time of trial it

was assumed by all parties that, although experts might disagree in individual cases, the principles underlying bite mark analysis were valid and true.

¶ 70     In support of his due process claim, Prante cites federal decisions that have recognized a due process claim where the defendant alleges the improper admission of subsequently discredited forensic evidence. See, *e.g.*, *Lee v. Houtzdale SCI*, 798 F.3d 159, 162 (3d Cir. 2015) (fire science and gas chromatography); *Ege v. Yukins*, 485 F.3d 364, 375-78 (6th Cir. 2007) (bite marks). These decisions are inapposite. They do not apply Illinois law, nor do they recognize the rule adopted by this court in *Brown*.

¶ 71     In the absence of any allegation that the State *knowingly* used the false bite mark testimony or that the State failed to exercise diligence to discover that the testimony was false, Prante has not pled a cognizable due process claim under Illinois law. Accordingly, the circuit court properly denied Prante leave to file his due process claim. We therefore reverse the judgment of the appellate court allowing Prante to go forward on that claim. Because he has not pled a cognizable due process claim under Illinois law, we need not consider whether Prante has satisfied the cause and prejudice test.

¶ 72                                Actual Innocence Claim

¶ 73     In his postconviction petition, Prante raises as his "primary ground for relief" a claim of actual innocence pursuant to *Washington*, 171 Ill. 2d 475. In *Washington*, this court recognized a "freestanding" claim of actual innocence as a matter of state law under the due process clause of the Illinois Constitution of 1970 (Ill. Const. 1970, art. I, § 2). *Washington*, 171 Ill. 2d at 485-90. We explained that such a claim is one in which newly discovered evidence is not being used to "supplement an assertion of a constitutional violation" with respect to the petitioner's trial. *Id.* at 479-80. Instead, a freestanding claim of actual innocence is one in which it is alleged that newly discovered evidence makes a persuasive showing that the petitioner did not commit the offense with which he was charged and was, therefore, wrongfully convicted. *Id.* at 489.

¶ 74     To obtain relief when raising a claim of actual innocence, the newly discovered evidence offered by the petitioner must be material, noncumulative, and of such a

conclusive character that it would " 'probably change the result on retrial.' " *Id.* The new evidence must place the trial evidence in a different light and undermine the court's confidence in the factual correctness of the guilty verdict. *People v. Coleman*, 2013 IL 113307, ¶ 97. Where, as here, a petitioner raises an actual innocence claim in a motion for leave to file a successive postconviction petition, the petitioner should be denied leave to file only where, as a matter of law, no colorable claim of actual innocence has been presented. *Edwards*, 2012 IL 111711, ¶¶ 31-33. This simply means that the petitioner must produce newly discovered evidence that, when considered along with all the evidence presented at trial, would probably lead to a different result on retrial. *Taliani*, 2021 IL 125891, ¶ 59.

¶ 75    In this case, the parties' dispute centers primarily on the conclusive character of Prante's evidence regarding the shift in scientific understanding that has taken place with respect to bite mark analysis. Because bite mark analysis has been discredited, Prante argues that, in any retrial, the State would not be permitted to introduce expert opinion testimony identifying the wound on Brown's right collarbone as a bite mark and would not be permitted to introduce any testimony comparing that wound to dental impressions of Prante's teeth. Given this fact, Prante contends that his newly proffered evidence is of such conclusive character as to warrant relief.

¶ 76    In support of this contention, Prante focuses largely on the testimony of Vicki White and Spencer Bond and their statements that Prante told them he had seen bite marks on Brown's shoulder or collarbone at a time when the public had not yet been told of any such injury. Prante contends that, "[i]f the State cannot tell the jury there are bite marks at all, there is no point of the testimony" and, without that evidence, "a huge portion of the State's case unravels." Thus, according to Prante, he has presented conclusive new evidence that merits postconviction relief. We disagree.

¶ 77    Even assuming that, in a retrial, the State would not be permitted to introduce expert testimony identifying a bite mark on Brown's collarbone, there would be no bar to admitting Prante's statements that he, himself, saw a bite mark. Nor would there be any prohibition to the State offering testimony that there was a wound (of unknown cause) on Brown's collarbone. Thus, even without the expert testimony identifying a bite mark, a jury would still hear evidence that Prante was aware of

an injury on Brown's body that could only have been known by someone who participated in the murder.

¶ 78    Further, Prante's statements describing the crime scene were not limited to saying that he saw a bite mark. He told Spencer Bond that Brown was found "in a curled position stuck in a pail of water down in the basement" and similarly told Vicki White and Harold Pollard that she was found in a "curled position" in the basement. Prante also told Spencer and Pollard that Brown had "been tied up" or had her "hands tied behind [her] back." None of this evidence would be affected by the exclusion of the expert testimony regarding bite mark analysis.

¶ 79    Prante notes that none of the witnesses who testified regarding Prante's statements shared those statements with police near the time of the murder. Prante points to the affidavit from Dr. Franklin attached to his petition that discusses false memories and contends this is new evidence that supports the conclusion that the witnesses' testimony was tainted and that they only testified as they did because of reports discussing the crime they heard in the media after Brown's body was exhumed and the second autopsy was conducted. Prante contends that this is an additional basis for allowing him to file his actual innocence claim. Here, too, we disagree.

¶ 80    Dr. Franklin's affidavit is cumulative to evidence introduced at trial. The witnesses were questioned as to why they did not come forward earlier with their information regarding Prante. They explained that the police either did not ask them about Prante or they were unaware that his statements about seeing Brown's body were important. Further, impeachment evidence such as that offered in Dr. Franklin's affidavit typically is insufficient to justify postconviction relief. *People v. Ortiz*, 235 Ill. 2d 319, 335 (2009).

¶ 81    Additional evidence presented by the State at trial is also unaffected by the shift in scientific understanding of bite mark analysis. Scroggins testified that Prante met and spoke with Brown the night before the murder, expressed a sexual interest in her, and was irritated that he could not join her party. Detective McEuen and Pollard also testified that Prante said Brown was "beautiful" and "nice-looking" and that he was sexually attracted to her.

¶ 82    In addition, Prante admitted at trial that he was at Main's house from approximately 10 a.m. until shortly after the police arrived in the evening. Ms. Vancil, Main's aunt and neighbor, corroborated that account, stating that Prante was on Main's front porch from about 10 a.m. to 11 a.m., "disappeared" for about an hour, and then returned to the porch around noon. Prante also admitted that he saw Brown in her front yard in the morning or early afternoon on the day of the murder and stated she was wearing a "white flowered top." In one of the recorded conversations with Spencer Bond, Prante said that he may have spoken with Brown in the driveway that day. These statements are consistent with testimony by Edna and Eric Moses that they saw a man and a woman matching Brown's description in her driveway and that the woman was wearing a floral top.

¶ 83    Additional evidence offered by the State showed that, later that evening, Prante told Pollard that Brown had been killed and stated that her "body was found curled up on the floor with its hands tied behind its back." When asked by Pollard how he knew this, Prante claimed to have looked over a policeman's shoulder at the crime scene. Yet Brown's body was found in the basement, and the house had been secured by the police. Prante thus could not have seen Brown's body in the way he described to Pollard.

¶ 84    Within a few days, Prante told Spencer Bond that Brown was found "in a curled position stuck in a pail of water down in the basement" and had "been tied up." These were also facts that, at the time the statements were made, could only have been known by someone who participated in the murder.

¶ 85    In addition, when Prante was first interviewed by the police he could not account for his whereabouts around the time of the murder. Only later did he state that he was on Main's porch at that time. Further, all the witnesses who spoke with Prante following the murder described him as nervous and agitated and stated he told them that he and Main had to get their stories straight.

¶ 86    Even absent the bite mark testimony, the State presented considerable evidence that Prante had the motive and opportunity to commit the crime and, most importantly, that he was aware of facts about the crime scene at a time when they could only have been known by someone who participated in the murder. As this court has noted, "[b]ecause a successive postconviction claim of actual innocence undermines the finality of a conviction obtained after a fair trial, a postconviction

petitioner seeking to file a claim of actual innocence is held to a high standard." *Taliani*, 2021 IL 125891, ¶ 68. Having carefully reviewed the record, we conclude that Prante has not met the high standard for setting forth a colorable claim of actual innocence. The circuit court properly denied Prante leave to file his claim of actual innocence. Accordingly, we affirm that part of the appellate court's judgment that affirmed the circuit court's ruling with respect to that claim.

¶ 87                                Remaining Claims

¶ 88     In his postconviction petition Prante also raised three additional claims, including claims of ineffective assistance of trial and appellate counsel. Because the appellate court allowed Prante to go forward on his separate due process claim, it did not reach these three additional claims. 2021 IL App (5th) 200074, ¶ 97. We therefore remand this cause to the appellate court to address the unresolved claims. See, *e.g.*, *People v. Lowery*, 178 Ill. 2d 462, 473 (1997) ("where trial errors were raised but not ruled upon in the appellate court, it is appropriate for this court to remand the cause to the appellate court for resolution of those remaining issues").

¶ 89                                 CONCLUSION

¶ 90     For the foregoing reasons, the judgment of the appellate court granting Prante leave to file his due process claim is reversed. The judgment of the appellate court denying Prante leave to file his claim of actual innocence is affirmed. The cause is remanded to the appellate court to resolve Prante's remaining claims.

¶ 91     Appellate court judgment affirmed in part and reversed in part.

¶ 92     Cause remanded.

¶ 93     JUSTICES ROCHFORD and O'BRIEN took no part in the consideration or decision of this case.