2024 IL App (1st) 231219-U

No. 1-23-1219

Order filed October 15, 2024.

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 08 CR 8237 |
| | ) | |
| ORLANDO AVILA, | ) | The Honorable |
| | ) | Stanley J. Sacks, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE LAVIN delivered the judgment of the court.
Justices Pucinski and Cobbs concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Circuit court's denial of leave to file a successive postconviction petition affirmed where defendant did not present newly discovered evidence in support of his claim of actual innocence.

¶ 2    Defendant Orlando Avila appeals from the circuit court's denial of his motion for leave to

file a successive postconviction petition. On appeal, defendant argues that the circuit court erred

in denying his motion because he presented a colorable claim of actual innocence supported by newly discovered evidence. We affirm.

¶ 3    Following a jury trial, defendant Orlando Avila was convicted of first degree murder and sentenced to 65 years in prison, which included a 20-year firearm enhancement.

¶ 4    The following facts are adopted from our order on direct appeal. *People v. Avila*, 2013 IL App (1st) 111732-U.

¶ 5    Defendant was charged with multiple offenses in relation to the October 31, 2007, murder of Laticia Barrera, who was fatally shot in her front yard at 4819 South Seeley Avenue in Chicago.[1] Prior to trial, the State listed Nemroy Murray, who was later identified as an intended victim of the shooting, in its answer to discovery as a potential witness. At trial, the State presented evidence that defendant and another gunman fired shots that struck Laticia as they attempted to harm members of the Two-Six gang.

¶ 6    Artemio Rojas, Laticia's neighbor, testified he and his family had just returned home from trick-or-treating with Laticia and her three children. Rojas heard shots and saw two gunmen at the corner of 48th Street and Seeley; the two individuals who were the apparent intended targets of the shooting were running toward Rojas. Rojas testified one of the gunmen wore a black hooded sweater.

¶ 7    Felipe Santiago testified that as he parked his vehicle near his residence, he saw two men at the corner of 48th and Seeley. The men wore hooded shirts, made hand gestures, and screamed before one man fired six shots. Santiago saw the faces of both men. Santiago identified defendant

---

[1] Because Laticia Barrera has the same last name as a witness, Christian Barrera, we refer to them by their first names.

in court as the person he saw discharging the firearm. The day after the shooting, Santiago viewed a photo array that did not include a photo of defendant, and he did not identify anyone in that array. Approximately a week later, on November 9, 2007, Santiago viewed another photo array and identified defendant as the shooter. Defendant was arrested on November 12, 2007, and placed in a lineup; Santiago viewed that lineup and told police the shooter "looked a lot like" defendant.

¶ 8    Chicago police detective Thomas Carr testified he showed Santiago a photo array that included pictures of Cecelio Rendon and Hector Dominguez because Murray had identified them as the offenders in another photo array. Both Rendon and Dominguez had been taken into custody shortly after the shootings but were released after Carr investigated their alibis. Carr testified the investigation of the shooting revealed Murray and Juan Hernandez were the intended victims.

¶ 9    Raynal Watson testified that he was standing in his front yard at 4810 South Seeley when he saw three Hispanic men walking toward the intersection. The men wore black pants and black hooded shirts. Two of the men stood outside a store and exchanged words with two Hispanic men who emerged from the store and displayed a gang sign. The men who left the store were members of the Two-Six gang, and the men in front of the store shot at the Two-Sixers, who ran away. Watson saw that Laticia had been shot. Watson did not speak to police at the scene. Watson identified defendant in court as the individual he saw shooting when Laticia was shot.

¶ 10    Christian Barrera, who is not related to Laticia, testified he was with three friends near 48th and Seeley when the shooting occurred. Earlier that night, Christian met Guadalupe "Sticks" Martinez at Martinez's residence. Two people he knew as Daniel and Roy were also present; Roy was later identified by another witness as Murray. Christian testified that Murray was a member

of the Two-Six gang. After meeting at Martinez' residence, Christian and Murray left to throw eggs at vehicles. They became separated, and Christian returned to Martinez's residence.

¶ 11    Christian testified that he, Martinez, and Daniel were talking in Martinez' front yard when he heard a gunshot and crouched down. Christian turned around and saw defendant, who was wearing a black hooded sweatshirt, fire four shots. Christian identified defendant in court. Christian saw Murray run from the area of the shooting. Christian went home after the shooting and did not speak to police that day because he and his family were not into "snitching."

¶ 12    Martinez testified he and Daniel saw two people wearing hoodies in an alley prior to the shooting. Martinez thought they were Saints because they came from "Saints territory." Martinez saw the same individuals at the corner of 48th and Seeley and identified one of those people in court as defendant. Although defendant wore a hoodie, the hood did not conceal his face. Martinez heard defendant yell "Saint love," aim a firearm, and fire six shots at Murray and Hernandez. The person with defendant also discharged a firearm. Martinez did not tell police that he saw the shooters.

¶ 13    Gregorio Reyes testified he had known defendant for a few years, and they lived near each other. Reyes was aware of the Latin Saints gang and knew defendant by the nickname "Little Paulina." The State asked if Reyes also knew "Little Paulina" by the name "Sinister." Reyes responded he did not. Reyes said he was not a member of the Latin Saints gang and was not sure if defendant was a gang member. Reyes denied that defendant's tattoos represented his membership in the Latin Saints. Reyes denied that defendant had ever admitted to him that he was involved in Laticia's murder. Instead, Reyes said that the police arrested him on March 10, 2008, for having a fake resident alien identification card. Two detectives spoke to him at the police

station and said they had information that Reyes and defendant were cousins who were "running together." Reyes denied that he volunteered any information to the detectives and only told them that he heard about Laticia's murder on the news. The State asked Reyes if he told the detectives that he knew defendant, who was also known as "Little Paulina" and "Sinister," for about 10 years and that he had been "hanging out" with defendant for about 5 years. Reyes responded, "Yes, because we know each other from family." However, Reyes denied being at defendant's house two days after Laticia was murdered, denied that defendant looked nervous and scared on that day and did not want to leave his house, and denied that defendant told him that day that he and another gang member went to shoot some "Two-Sixers" and might have shot somebody else instead. Reyes testified that the detectives questioned him "for hours" and threatened to get immigration services involved. Reyes further acknowledged that he testified before a grand jury on March 27, 2008. He did not tell the prosecutor at that time about a detective threatening to deport him because he did not trust anybody.

¶ 14    The State then questioned Reyes about whether he gave specific testimony before a grand jury on March 27, 2008. These included statements that Reyes was at defendant's house two days after Laticia was murdered, that defendant seemed nervous at the time, and that defendant told Reyes that he was involved in Laticia's murder. Reyes initially testified that he did not recall making these statements before the grand jury and later testified that the two detectives told him what to say to the grand jury. Reyes agreed that it would be a "violation" to testify against another gang member. Reyes denied telling a prosecutor several days before defendant's trial that the Latin Saints would kill him and his family if he testified against defendant. Reyes also denied having

been hit in the head with a two by four by some Latin Saints who threatened him not to testify against defendant.

¶ 15    The State introduced the transcript of Reyes's grand jury testimony by calling Assistant State's Attorney (ASA) Michael Hogan, the prosecutor who met with Reyes on March 27, 2008, and who questioned Reyes before the grand jury that day. ASA Hogan testified that he met with Reyes on March 27 and interviewed him about Laticia's murder. ASA Hogan testified that Reyes told him that he had been treated "fine" and that Reyes never mentioned having been threatened by detectives. Reyes told ASA Hogan that he was motivated to testify before the grand jury because "he felt bad about what had happened." ASA Hogan did not ask Reyes if he was having any problems with immigration. The trial court then allowed ASA Hogan to publish Reyes's grand jury testimony and admitted the grand jury testimony as substantive evidence pursuant to section 115-10.1 of the Code of Criminal Procedure (725 ILCS 5/115-10.1 (West 2010)).

¶ 16    Before the grand jury, Reyes testified that he went to defendant's house two days after Halloween. Defendant seemed nervous and told Reyes that he did not want to leave the house. A person named "Kalicala" arrived with a person named "Rubio." Kalicala told Rubio that he had "balls" for what he had done. When Kalicala lifted Rubio's shirt, Reyes saw that Rubio's torso was bruised. Reyes knew that Rubio had joined the gang because of the bruises he had sustained. After Rubio and Kalicala left defendant's house, Reyes questioned defendant about what happened to Rubio and what happened at 48th and Seeley on Halloween night. Defendant said that Rubio "got balls" and "knows how to shoot." When Reyes asked defendant about the lady who was shot at 48th and Seeley, defendant responded, "I don't know if I shot somebody." Defendant also said

that on that day "they went to go shoot the Two-Six," which Reyes told the grand jury was another gang. Reyes then "left it alone" and did not ask defendant any further questions.

¶ 17    The State also called Detective Joaquin Mendoza. Detective Mendoza testified that on March 10, 2008, he and Detective Luis Otero were contacted by Sergeant Frank Luera and informed that the police had Reyes in custody, and that Reyes said he had information about Laticia's murder. Detective Mendoza had not previously heard of or known about Reyes. That evening, Detectives Mendoza and Otero interviewed Reyes at the police station, and Reyes told the detectives that his cousin, defendant, was one of the shooters in Laticia's murder. Reyes knew his cousin by the nicknames "Lil Paulina" and "Sinister." Reyes told the detectives that defendant personally told him that he had "done the shooting over at 48th and Seeley." Reyes said that this conversation took place two days after the murder at defendant's home. Jonathan Ochoa, known as "Kaleeks," and Rubio, known as "Shorty," were also present when this conversation occurred. Detective Mendoza did not threaten Reyes with deportation or tell him what to say. The detectives told Reyes to contact them once he was released by the police.

¶ 18    Detectives Mendoza and Otero spoke to Reyes again two days later when Reyes contacted Detective Otero. The detectives met Reyes at 49th and Morgan Street, a location that Reyes selected because he felt it was safe, and spoke to him in their squad car. Reyes said that he was out of town at the time of Laticia's murder but heard about the shooting on the news. Reyes told the detectives that he was at defendant's house two days after the murder when defendant said that he and Rubio participated in the shooting. Reyes explained that he had known defendant for about 10 years from his aunt's marriage to one of defendant's family members and that Reyes had been "hanging out" with defendant for about 5 years. When Reyes was at defendant's home two days

after the murder, defendant was "very paranoid" and was afraid to leave his house. Ochoa, Rubio, and Ochoa's brother were also at defendant's house that day. Ochoa asked Rubio if it hurt when Rubio was hit by the gang. Ochoa lifted Rubio's shirt and Rubio had bruises on his upper torso. After Rubio and Ochoa left, defendant told Reyes that defendant was "one of the shooters involved in the incident on Halloween where the mother got killed" and that Rubio had a "pair of balls" because Rubio was the second shooter. Defendant said that he and Rubio had gone to the area of murder to "shoot at Two-Sixers." Reyes told the detectives that defendant then changed the subject and would not talk about the murder. Reyes identified a photograph of defendant and a yearbook photograph of Rubio. The detectives could not locate Ochoa or Rubio.

¶ 19    Chicago police officer Eric Wier testified as a gang expert. Officer Wier explained that there was an ongoing war between the Two-Six and Latin Saints gangs. Halloween was an important day for the Latin Saints and in the days leading up to Halloween, the gang members would go on "missions," which included shootings and other violent acts. Officer Wier identified Murray and Hernandez as members of the Danville Two-Six gang, and defendant and Reyes as members of the Latin Saints. Officer Wier explained that it was a violation of gang rules for one gang member to testify against a fellow gang member or to cooperate with the police, and some gang members intentionally try to obstruct police investigations.

¶ 20    Officer Wier further testified that Reyes contacted him in October 2008 and said that he feared for his life because the Latin Saints were going to kill him. Reyes asked to be relocated but ultimately turned down a relocation offer from the State. Later, in preparing for trial, Officer Wier had another conversation with Reyes. Reyes stated that he could not testify because the Latin Saints had already hit him with a two-by-four and Reyes feared he would be killed if he testified. When

Officer Wier told Reyes he would be committing perjury, Reyes asked what the penalty was for committing perjury. Officer Wier told Reyes it was 15 years' imprisonment, and Reyes said that he would rather spend 15 years in jail than be killed by the Latin Saints.

¶ 21    Finally, the State presented evidence that sometime in March 2008, Watson viewed a photo array and identified defendant as one of the gunmen. Defendant was arrested on March 26, 2008, and on that date, Watson, Martinez, and Christian identified defendant in separate lineups.

¶ 22    For the defense, defendant's mother and sister offered alibi testimony; however, both were impeached with their grand jury testimony.

¶ 23    The court sentenced defendant to a prison term of 65 years.

¶ 24    On direct appeal, this court affirmed defendant's conviction, finding that no error occurred to warrant plain error analysis regarding statements made by the prosecutor during opening statement and closing argument, and defendant failed to establish prejudice to satisfy a claim of ineffective assistance of trial counsel. *People v. Avila*, 2013 IL App (1st) 111732-U.

¶ 25    Defendant then filed a postconviction petition, alleging, *inter alia*, that his sentence was unconstitutional pursuant to *Miller v. Alabama*, 567 U.S. 460 (2012). The circuit court summarily dismissed the petition finding the claims to be frivolous and patently without merit.

¶ 26    On appeal, this court affirmed the circuit court's summary dismissal of defendant's postconviction petition, finding that defendant failed to allege a cognizable claim that his sentence was unconstitutional. *People v. Avila*, 2018 IL App (1st) 153207-U.

¶ 27    Defendant subsequently filed a motion for leave to file a successive postconviction petition, asserting, *inter alia*, a claim of actual innocence. To support his claim of actual innocence, defendant attached affidavits from Jesus Garcia and Murray.

¶ 28    In his affidavit, Garcia averred that at approximately 6 p.m. on October 31, 2007, he was near 47th and Seeley walking towards Martinez' residence. When he was approximately three houses away, he saw two individuals walk to the corner holding firearms. The individuals were "representing and flagging 'saints' to the 'Two-Six' " that were near 49th and Seeley. Garcia then heard five or six gunshots. After the gunshots, the shooters ran towards Damen Avenue.

¶ 29    Garcia identified one of the shooters as Oswaldo Rangel and stated that the other shooter was unidentifiable. Rangel was a member of the Latin Souls gang with Garcia. Garcia asserted that Rangel and the other shooter were "false flagging," so the Two-Six gang members would think another gang committed the shooting. At that time, the Latin Souls and Two-Six gangs were "at war." Garcia did not know who was arrested for the shooting until he met defendant in prison. He heard defendant discussing his case and told defendant what he observed. Garcia averred that defendant was not involved in the shooting and was not in the area. Garcia did not come forward sooner because he "feared being killed by the Souls." He averred that defendant was innocent and felt that coming forward "with the truth" was the "right thing to do."

¶ 30    In his affidavit, Murray averred that on the day of the shooting, he, Hernandez, and Christian threw eggs at a SUV "full of bangers." The "bangers" exited the vehicle and began "represent[ing] and disrespect[ing]," by saying "Tsk and Two six killa and souls world." Christian ran in a different direction than Murray and Hernandez. As Murray and Hernandez walked towards Seeley, they saw individuals in an alley who yelled "saint love" and were "disrespecting." One of the individuals had something over his face, and the other had nothing over his face. Murray recognized one of the individuals from the SUV. He knew that the individuals were "false flagging" after they tried to kill him and Hernandez, and he and Hernandez "heard everyone saying

it was the saints." Murray and Hernandez agreed "not to say it was the latino souls." Murray "went along" with everyone saying it was the Saints and said he observed one individual with a teardrop under the left eye "as only saints use left in [their] area." He later identified two Saints with whom he previously "gotten into it with." He knew that a Saint was arrested. Murray stated that he "no longer gang[b]ang," and this "weighed on him." Murray knew that defendant was not the individual he saw in the SUV or who attempted to kill him. He saw the shooter the next summer with a group of Latin Souls. Murray did not want Barrera's "real killer" to remain free.

¶ 31    Defendant also attached his own affidavit averring that he was not involved in the shooting. Because he was not present in the immediate area of the shooting, he could not have known that Murray and Garcia were witnesses. He could not have sought out Murray because the "Saints and Two-six gangs were at war." Therefore, he could not have discovered them sooner through due diligence. At the time the shooting occurred, defendant was a "saint," and the "Saints have always been at war with both the Souls and Two-Six gangs."

¶ 32    On January 26, 2023, the circuit denied defendant's motion for leave to file a successive petition, finding, in relevant part, that defendant failed to state a colorable claim of actual innocence.

¶ 33    On May 9, 2023, defendant mailed a motion to this court requesting leave to file a late *pro se* notice of appeal and for appointment of counsel, which this court granted on July 12, 2023.

¶ 34    On appeal, defendant argues that the circuit court erred in denying him leave to file his successive postconviction petition because he set forth a colorable claim of actual innocence.

¶ 35    The Act allows a criminal defendant to challenge a conviction for violations of federal or state constitutional rights, or both. *People v. Jean*, 2024 IL App (1st) 220807, ¶ 28. The Act

contemplates the filing of a single postconviction petition, and "[s]uccessive petitions are highly disfavored." *People v. Horshaw*, 2024 IL App (1st) 182047-B, ¶¶ 34-35. Prior to filing a successive petition alleging actual innocence, a defendant must first file a motion for leave to file a successive postconviction petition (*People v. Taliani*, 2021 IL 125891, ¶ 58) and must support the claim with evidence that is newly discovered, material, noncumulative, and "of such conclusive character that it would probably change the result on retrial" (*People v. Edwards*, 2012 IL 111711, ¶ 32). Defendant's claim and supporting evidence must set forth "a colorable claim of actual innocence" (*id.* ¶ 33) and "place[] the trial evidence in a different light[,] and undermine[] the court's confidence in the judgment of guilt" (*People v. Robinson*, 2020 IL 123849, ¶ 48). A colorable claim of actual innocence raises the probability that it is more likely than not that no reasonable juror would have convicted defendant in light of the new evidence. *Edwards*, 2012 IL 111711, ¶ 33.

¶ 36    When considering a defendant's motion for leave to file a successive petition, the court must take all well-pleaded facts in the petition and supporting affidavits as true. *People v. Warren*, 2016 IL App (1st) 090884-C, ¶ 77; *People v. Williams*, 392 Ill. App. 3d 359, 367 (2009). The circuit court is "precluded from making factual and credibility determinations." *Robinson*, 2020 IL 123849, ¶ 45. Leave to file a successive postconviction petition should be denied only where "it is clear from a review of the petition and supporting documentation" that the defendant "cannot set forth a colorable claim of actual innocence." *People v. Flournoy*, 2024 IL 129353, ¶ 77. We review *de novo* the circuit court's denial of leave to file a successive postconviction petition. *Robinson*, 2020 IL 123849, ¶ 40.

¶ 37    Defendant asserts the circuit court erred in denying him leave to file a successive postconviction petition because the affidavits of Murray and Garcia were newly discovered and supported his claim of actual innocence.

¶ 38    We find that neither Garcia's nor Murray's affidavit are of such a conclusive nature that it would probably change the result on retrial. See *Robinson*, 2020 IL 123849, ¶ 47.  With regards to Garcia's affidavit, he averred that defendant was not the shooter and identified Rangel as a shooter. Murray, in his affidavit, asserted that he knew defendant was not one of the shooters. In contrast to their affidavits, at trial, the State presented several witnesses who identified defendant as the shooter. Santiago testified that he saw the faces of both shooters and identified defendant in court as one of the shooters. Christian testified that he observed defendant, who was wearing a black hooded sweatshirt, fire four shots on the day of the shooting and identified defendant in court as the shooter. Watson identified defendant in court as the individual he saw shooting when Laticia was shot. Martinez testified that on the day of the shooting, defendant wore a hoodie that did not conceal his face. Martinez heard defendant yell "Saint love," aim a firearm, and fire six shots at Murray and Hernandez. Martinez identified defendant in court as one of the shooters.

¶ 39    Furthermore, the State presented the grand jury testimony of Reyes, who testified that two days after the shooting, defendant admitted to him that he was one of the shooters. While Murray's and Garcia's affidavits, when taken as true, create a conflict among the witnesses to the shooting, they do not rebut defendant's inculpatory statement and, thus, are not so conclusive as to lead to an acquittal on retrial. *Robinson*, 2020 IL 123849, ¶ 60 ("whether a [defendant] has satisfied the low threshold applicable to a colorable claim of actual innocence, the court considers only whether the new evidence, if believed and not positively rebutted by the record, could lead to acquittal on

retrial"). Considering the affidavits along with the evidence presented at trial, we cannot find that Garcia's and Murray's affidavits would probably change the result on retrial. *People v. Prante*, 2023 IL 127241, ¶ 74 (a defendant "must produce newly discovered evidence that, when considered along with all the evidence presented at trial, would probably lead to a different result on retrial").

¶ 40   Accordingly, defendant did not present newly discovered evidence in support of his actual innocence claim that would place the trial evidence in a different light and undermine the court's confidence in the judgment of guilt. *Robinson*, 2020 IL 123849, ¶ 48.

¶ 41   For the reasons stated, we affirm the judgment of the circuit court denying defendant leave to file his successive postconviction petition.

¶ 42   Affirmed.