2023 IL App (2d) 22040-U
No. 2-22-0240
Order filed August 22, 2023

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 08-CF-1256 |
| DWAYNE SHIPP, | ) ) ) | Honorable Divya K. Sarang, |
| Defendant-Appellant. | ) | Judge, Presiding. |

PRESIGING JUSTICE McLAREN delivered the judgment of the court.
Justices Birkett and Kennedy concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The second-stage dismissal of defendant's successive postconviction petition is affirmed over his contention that his appellate counsel provided unreasonable assistance. Trial court is affirmed.

¶ 2   Defendant Dwayne Shipp appeals from the trial court's order granting the State's motion to dismiss his successive petition for relief filed pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2018)). On appeal, defendant contends that his postconviction counsel provided unreasonable assistance by failing to allege that appellate counsel was ineffective for failing to raise the following issues on direct appeal: 1) trial counsel was ineffective for failing

to request Illinois Pattern Jury Instruction, Criminal, No. 3.17 (4th ed. 2000) (hereinafter, IPI Criminal 4th No. 3.17) concerning accomplice-testimony; and 2) the trial court erred by admitting as substantive evidence the 911 recording. For the reasons that follow, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4    Defendant was charged by indictment with one count of attempt first degree murder (720 ILCS 5/8-4(a), 9-1(a)(1) (West 2008)), and two counts of aggravated battery with a firearm (*id.* § 12-4.2(a)(1)), in the shooting of Robert Franklin.

¶ 5    At defendant's jury trial, Valerie Carpenter testified as follows. At the time of the shooting, she lived with defendant in an apartment at 461 North Lake Street in Aurora. Defendant was possessive, controlling, and abusive. Carpenter never called the police to report defendant's abusive behavior because she was afraid that defendant would do something to her daughter if she reported him to the police. On May 4, 2008, the night of the shooting, Carpenter and defendant came home from a cookout and argued about defendant using her car. Defendant told Carpenter he wanted some money, so Carpenter called Robert Franklin, her ex-boyfriend. Carpenter broke up with Franklin three or four months ago, but they still talked. Franklin agreed to give Carpenter some money, but when she got to his place, Franklin told her he did not have the money and had called Carpenter's parole officer because he was worried about her. Carpenter became upset with Franklin and left his place.

¶ 6    When Carpenter returned home, she and defendant argued again. After defendant went to the back room, Carpenter called Franklin and told him that she had calmed down and understood why he had called her parole officer. Then, defendant came up behind her, "snatched" the phone, and cussed out and threatened Franklin over the phone. According to Carpenter, defendant told

Franklin he "knows where he lives and where his sister lives and called her by name and knew that she had three kids and was threatening them." Defendant hung up the phone.

¶ 7     Carpenter testified that she and defendant continued to argue. Defendant wanted Carpenter to "go get" Franklin. Carpenter did not want to because she did not know what defendant was thinking. When Carpenter refused, defendant grabbed Carpenter's arm, pushed her down the hallway into the bathroom, pulled a gun out of his pants, and said, "It [is] either you or [Franklin] and if I didn't do what he said he would kill me." Carpenter said that when defendant pulled the gun on her, he was very close to her face, and she had no problem identifying him. Carpenter testified that the gun was a revolver. She stated that a "revolver spins around, and an automatic has a clip." Carpenter first saw the gun in April when defendant first "got it."

¶ 8     According to Carpenter, defendant told her exactly what to do. Defendant told Carpenter to go pick up Franklin and said that he only wanted to "put the fear of God into him." Defendant also told Carpenter that he was not going to do anything with the gun, he was just going to scare Franklin. Defendant told Carpenter that when she brought Franklin back, she should park on Plum Street. Defendant told Carpenter that he would be outside, and that Carpenter would never see him coming. Defendant did not tell Carpenter that he would be waiting in the apartment. Carpenter did what defendant told her because she was afraid. Carpenter called Franklin and told him that if he wanted to come over to her apartment she would come and pick him up. Franklin told Carpenter, "This better not be a set up." Carpenter replied, "why would it be?" and Franklin told Carpenter to pick him up.

¶ 9     Carpenter testified that when she arrived at Franklin's home, he put hot dogs, hamburgers, and a bottle of soda in a bag, and also brought his Chihuahua dog with him. When they arrived at Carpenter's apartment, she did not park on Plum Street. Instead, she parked on Williams, two

blocks away, because she "wanted to avoid the whole situation." When she and Franklin arrived at her apartment door, Carpenter told Franklin to wait in the hallway while she went inside to make sure everything was okay. Carpenter entered her apartment, looked around, came back into the hallway, and told Franklin that it was okay. They walked into the apartment together and Carpenter turned on the kitchen light.

¶ 10    Carpenter also testified that when Franklin sat down on the couch and turned on the television, the dog barked.  Carpenter and Franklin got up and saw defendant come down the hallway with a gun turned sideways. Defendant wore dark clothes, including a hoody, and a dark bandana on his face. According to Carpenter, defendant had the same gun that he had when he threatened her earlier. Carpenter knew that the man in the dark clothes was defendant because she knew his height and build and she recognized his voice. Franklin started screaming and defendant said, "you'd better shut the f**k up, I am going to kill you, you son of a bitch." Somehow, they all ended up on the couch and defendant told Franklin to open his mouth. At one point defendant got the gun in Franklin's mouth, and Franklin tried to pull the gun away from defendant. Franklin yelled to Carpenter, "call the cops!" Carpenter jumped up and ran into her bedroom and picked up the cordless phone. She tried to call 911, but the battery was dead. Defendant yelled at Carpenter "are you going to call the cops on me? You are going to call the cops on me, bitch?" Defendant told Carpenter that she had better shut Franklin up or he was going to kill him. Carpenter was trying to calm Franklin down because she did not know how serious defendant was about killing Franklin.

¶ 11    Carpenter testified that Franklin pushed the gun away from defendant and everything happened quickly after that. The next thing Carpenter knew, she and Franklin were out of her apartment and in the hallway of the building. They ran down the stairs and went outside. Franklin

said that he was calling the police. Carpenter also told Franklin to call the police. A man who let Carpenter into the building earlier was outside and asked her what was going on. Carpenter told the man that Franklin was talking to the police on his cellphone. As Carpenter was talking to a neighbor, Franklin was standing under a "carport" in the front of the apartment building when she heard "pop, pop, pop." Carpenter looked and saw Franklin hopping on one leg and then fall down. She knew the sounds were gunshots because she had heard gunshots before. She and the neighbor ran to Franklin.

¶ 12   Carpenter testified that, initially, she told police that defendant was not the gunman. Then she agreed to go to the police station and told detectives that "maybe" defendant was the gunman. After detectives returned and read her Miranda rights, Carpenter identified defendant as the gunman.

¶ 13   Carpenter testified that at the time of the shooting, she was on parole for three felonies and that the State initially charged her with the same offenses as defendant. However, she had entered into an agreement with the state's attorney's office that in exchange for her truthful testimony against defendant she would plead guilty to one count of aggravated battery and receive a sentence of 42 months in prison.

¶ 14   Robert Franklin testified as follows. Sometime prior to the shooting, Franklin dated Carpenter for four months. On the evening of the shooting, Carpenter came to Franklin's apartment and asked him for $50 and Franklin gave her the money. Later that evening, Carpenter called him and they talked for around 15 minutes. About 30 minutes later, Carpenter called him two more times. The third time, Carpenter called Franklin, there was a male voice on the phone who told Franklin that Carpenter was his girlfriend and that he should leave her alone. Later, Carpenter called Franklin again and said she was coming over to his apartment. Carpenter came to Franklin's

apartment and stayed for about 20 minutes and then asked him to come to her apartment. Franklin took his dog (a half miniature "pinscher" and half Chihuahua) with him and got into Carpenter's car and they drove to her apartment.

¶ 15    Franklin testified that Carpenter drove to Plum Street which was about a block and a half from Carpenter's apartment building. When they got into the apartment, Carpenter went first, then Franklin's dog, then Franklin. When Franklin walked into the apartment, he did not sit on the couch in the main room because his dog ran down the hallway like she was scared. Franklin looked up and saw a man wearing blue jeans, a dark T-shirt, and what looked like a ski mask. The man was about three feet away from Franklin. The man pointed a gun at Franklin and told Franklin to "Shut the f**k up." Franklin thought the voice belonged to the same person who spoke to him on the phone earlier that evening. The man ordered Franklin on the couch, and Franklin obeyed. The man put the gun in front of Franklin's face and said that he wanted the gun in Franklin's mouth. The man repeatedly told Franklin to open his mouth so he could put the gun in there. As the gun was inches from Franklin's face, he begged the man not to kill him. Franklin then saw Carpenter coming down the hallway with a phone in her hand. The phone had a red light. The man said, "What the hell are you doing?" The man ordered Carpenter to sit down. Franklin heard the man call Carpenter by her name.

¶ 16    Franklin also testified that at some point he stood up and put his hand around the gun and was able to point it in the air. Then Franklin slowly walked to the door, left the apartment, and ran down the hallway. The man did not follow him. Franklin ran down the back stairs, yelled for his dog and then called 911. When Franklin got out of the building, he ran to Lake Street in front of the building. While speaking to the 911 operator, Franklin ran outside in front of the building. He saw a man run from the north of the building to the middle of Lake Street. Franklin "freaked out"

and ran a few feet toward some rocks in the front of the building because he saw cover there. He dove behind the rocks. He saw the man raise the gun and fire shots. Franklin did not know how many shots were fired, but he knew he had four holes in his left leg. Franklin saw the man on the corner of Williams and Route 31 and Lake Street. The man ran into the street, raised the gun, and fired again.

¶ 17    According to Franklin, the man ran down Williams Street, going west away from the building. Franklin identified the man as the same man who held a gun on him in Carpenter's apartment. After Franklin was shot, he hobbled over to the apartment building's awning and laid down. The police arrived quickly. Franklin was bleeding and eventually was taken to the hospital where he was treated for his gunshot wounds. He was shot in the calf, twice behind the knee, and once in the lower thigh. He had scarring and nerve damage from the gunshots.

¶ 18    After Franklin testified, the State moved to play the recording of Franklin's 911 call to the jury. Defense counsel objected on the bases that the 911 recording was hearsay that did not fall within an exception, that it was cumulative to Franklin's testimony, and that it was prejudicial because it could affect the jury "in an emotional way." The trial court overruled the objection and held that the 911 recording was admissible as an excited utterance.

¶ 19    On the 911 recording Franklin described the gunman and expressed concern for his dog. Franklin screamed throughout the call and at one point he exclaimed that the gunman had his dog, and the 911 operator told him to stay away from the gunman. When Franklin told the operator that he saw the gunman running down Williams Street, four shots are heard and Franklin yells, "I'm shot, I'm shot, I'm shot!"

¶ 20    Aurora police officer Michael Fabri testified that on the night of the shooting, he was sitting in the parking lot of the Prisco Center at the corner of Illinois and North Lake when he received a

dispatch call around 11:30 p.m. regarding a person with a weapon a 461 North Lake, which was very close to his location. Fabri started driving south on Lake Street, and as soon as he came to a slight curve in the road, he saw the building at 461 North Lake. Fabri saw a person run from the parking lot into the road, stop in the middle of the road, turn toward the building, and fire gunshots. Fabri saw the muzzle flash from the firearm and heard the shots. Fabri heard four to six shots. It was dark outside but there were streetlights along Lake Street, and he had the lights on from his paddy wagon. The shooter was approximately five foot seven to five foot eight, weighed between 170 to 190 pounds, and wore all dark clothing with either a mask or a hoody. Fabri was about 100 to 150 yards away from the shooter.

¶ 21    Jessica Novickas, who lived on the third floor of 461 North Lake Street, testified that at around 11:30 p.m. on the night of the shooting, she heard someone run down the stairs yelling loudly. She walked to her front window, which faced Lake Street to the west, and heard a man yell, "He has a gun! He has a gun!" Then, someone ran from the side of the building up to the middle of Lake Street, turned around, and started shooting. The shooter was shooting toward the apartment building. The gun was pointed to the ground, angled to the front door. Novickas saw the flare of the gun and heard the gunshots. After the shooter was done firing the gun, he ran across the street to the west.

¶ 22    Novickas testified that her apartment building had one main entrance in the front of the building, and another entrance in the back. The building had two main stairwells, one near the front and the other near the back. The person who came out of the side of the building would have been coming from the driveway to the north. Right after she heard yelling, she saw a little dog in the hallway as she looked out of the peephole of her door. The dog was black and tan and may have been a Chihuahua.

¶ 23    Aurora Police Department evidence technician Irene Corp testified that at around 11:30 p.m. on the night of the shooting, she was called to 461 North Lake Street. Corp searched the area where Franklin was found to look for any spent cartridges. Corp explained that a semi-automatic handgun ejects a spent cartridge every time a round is fired, but a revolver does not. A revolver has a cylinder, and when it is fired the cartridge remains within the cylinder. Corp did not find any spent shell casings at the scene.

¶ 24    Aurora Police Detective Guillermo Trujillo testified that three days after the shooting, at defendant's request, he interviewed defendant during the investigation of the shooting. After refreshing his recollection with his written report, Trujillo testified that before any details were given to defendant, he asked Trujillo why his girlfriend was charged with the same crime when she never touched "the gun."

¶ 25    On cross-examination, defense counsel asked Trujillo if defendant asked why his girlfriend was charged with the same crime "when she had never even touched a handgun," and Trujillo answered, "That is correct." Trujillo admitted that defendant said what was contained in the written report.

¶ 26    During closing argument, the prosecutor argued that the offender wore all black to cover up who he was, but that Carpenter knew him because she had been going out with him, knew what he looked like, knew his voice, and knew how big and tall he was. So, defendant did not fool Carpenter.

¶ 27    In response, defense counsel argued that the most important primary issue was the identity of the man in black with the gun. The only piece of evidence that defendant was involved came out of Carpenter's mouth. The jury could not believe Carpenter because of her numerous inconsistencies with Franklin's testimony, which defense counsel listed. Defense counsel insisted

that Carpenter was not telling the truth during her testimony because she first told the police that she did not know who the shooter was and that defendant was not involved, and then she told the police that maybe he was involved. Defense counsel pointed out that Carpenter was familiar with the criminal justice system. Carpenter was trying to save herself because she was on parole at the time of the offenses. Carpenter had been charged with attempt first degree murder and aggravated battery with a firearm. But she struck a deal with the state's attorney's office: if she did not testify in a way that the state's attorney liked, she would not get the agreement. Defense counsel argued that "we" did not know what really happened because "we" could not rely on Carpenter.

¶ 28    During jury deliberations the jury asked to hear the 911 recording again. The jury listened to the recording twice in open court.

¶ 29    The jury found defendant guilty of attempt first degree murder and two counts of aggravated battery with a firearm. The aggravated battery counts merged with the attempt murder conviction, and the trial court sentenced defendant to 40 years' imprisonment. Defendant filed a direct appeal, arguing that his convictions for aggravated battery should be vacated under the one act, one crime doctrine. *People v. Shipp*, No. 2-10-0754 (2012) (unpublished summary order under Illinois Supreme Court Rule 23(c)). We dismissed the appeal as moot holding that when "the aggravated battery convictions merged into the attempt murder conviction, they were vacated." *Id.* ¶ 12.

¶ 30    In July 2013, with the aid of retained counsel, defendant filed a petition pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2012)). Defendant alleged that trial counsel provided ineffective assistance in that he failed to impeach a detective with a prior inconsistent statement and failed to seek to admit as substantive evidence the police report containing the prior inconsistent statement. Defendant also alleged that appellate counsel was

ineffective for failing to raise those same issues on direct appeal. The trial court dismissed the petition, at the first stage of the proceeding, finding that defendant failed to raise the gist of a constitutional claim.

¶ 31    Defendant appealed the trial court's first-stage dismissal of his postconviction petition alleging ineffective assistance of trial counsel and unreasonable assistance of retained postconviction counsel. *People v. Shipp*, 2015 IL App (2d) 131309, ¶ 1. On appeal, we held that trial counsel was not ineffective. *Id.* ¶¶ 11, 12. However, we declined to address defendant's claim of ineffective assistance of retained postconviction counsel, holding that "the right of reasonable representation provided by Rule 651(c) attaches at the second stage of postconviction proceedings and does not apply when a petition is dismissed at the first stage." *Id.* ¶ 16.

¶ 32    In November 2018 our Supreme Court held that defendants who retain private counsel are entitled to reasonable assistance at the first stage of proceedings under the Act. *People v. Johnson*, 2018, IL 122227, ¶ 23. In February 2019 defendant sought leave to file a successive postconviction petition. The trial court granted defendant leave to file a successive petition, and appointed counsel filed an amended petition, alleging ineffective assistance of counsel. On June 29, 2022, the trial court granted the State's motion to dismiss defendant's petition.

¶ 33    This timely appeal followed.

¶ 34                                          II. ANALYSIS

¶ 35    At issue in this appeal is whether the second-stage dismissal of defendant's petition was proper.

¶ 36    The Act provides a three-stage process for a criminal defendant to assert a violation of his constitutional rights. *People v. Addison*, 2023 IL 127119, ¶ 18. A postconviction proceeding does not substitute for a direct appeal but instead is a collateral attack on a final judgment. *People v.*

*Prante*, 2023 IL 127241, ¶ 58. "The purpose of a postconviction proceeding is to permit inquiry into constitutional issues involved in the original conviction and sentence that were not, and could not have been, adjudicated previously on direct appeal." *People v. English*, 2013 IL 112890, ¶ 22. Therefore, issues raised and decided on direct appeal or in a prior proceeding are barred as *res judicata*, and issues that could have been raised but were not, are forfeited. *People v. Daniels*, 2020 IL App (1st) 171738, ¶ 21.

¶ 37    The Act contemplates the filing of only one postconviction petition. *Prante*, 2023 IL 127241, ¶ 59. To file a successive petition, a defendant must obtain leave of court. 725 ILCS 5/122-1(f) (West 2020). Here, the trial court granted defendant leave to file a successive postconviction petition but dismissed his petition at the second stage.

¶ 38    At the second stage, the State may file either a motion to dismiss or an answer to the petition. 725 ILCS 5/122-5 (West 2018); *People v. Urzua*, 2023 IL 127789, ¶ 34. "Where the State seeks dismissal of a postconviction petition instead of filing an answer, its motion to dismiss assumes the truth of the allegations to which it is directed and questions only their legal sufficiency." *People v. Domagala*, 2013 IL 113688, ¶ 35. The trial court must then determine whether the petition and the accompanying documents make a substantial showing of a constitutional violation. *People v. Pingleton*, 2022 IL 127680, ¶ 34. A second-stage dismissal of a defendant's petition presents a legal question we review *de novo*. *Addison*, 2020 IL 127119, ¶ 1. If the defendant makes a substantial showing at the second stage, the petition is advanced for a third-stage evidentiary hearing. *Pingelton*, 2022 IL 127680, ¶ 34. If the petition does not make the requisite showing at the second stage, dismissal is proper. *Id.* At a third-stage evidentiary hearing, the trial court acts as factfinder, determines witness credibility and the weight to be given particular testimony and evidence, and resolves any evidentiary conflicts. *Domagala*, 2013 IL 113688, ¶ 34.

¶ 39    A claim of ineffective assistance of counsel is governed by the standard set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). *Pingelton*, 2022 IL 127680, ¶ 53. To prevail on such a claim, a defendant must demonstrate that counsel's performance was deficient and that such deficient performance substantially prejudiced defendant. *Id.* (citing *People v. Domagala*, 2013 IL 113688, ¶ 36, and *Strickland*, 466 U.S. at 687). To establish that counsel's performance was deficient, a defendant must show that counsel's performance was objectively unreasonable. *Id.* To establish substantial prejudice, the defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. To prevail on a claim of ineffective assistance of counsel, both prongs of the *Strickland* standard must be satisfied. *Pingelton*, 2022 IL 127680, ¶ 53.

¶ 40    The *Strickland* standard also applies to claims of ineffective appellate counsel. *People v. Petrenko*, 237 Ill. 2d 490, 497 (2010). A defendant raising such a claim must show both that appellate counsel's performance was deficient and that, but for counsel's errors, there is a reasonable probability that the appeal would have been successful. *Id.* Therefore, appellate counsel is not obligated to brief and argue every conceivable issue on appeal, and a defendant cannot prevail by claiming prejudice based on appellate counsel's failure to raise an issue that is not meritorious. *Pingelton*, 2022 IL 127680, ¶ 64. "If the underlying claim would not have succeeded on direct appeal, then 'there is no arguable legal basis' for defendant's claim of ineffective assistance of appellate counsel, and dismissal is 'proper.'" *People v. Randall*, 2021 IL App (1st) 191194, ¶ 66 (quoting *Petrenko*, 237 Ill. 2d at 501-02).

¶ 41    We now address defendant's argument that he made a substantial constitutional showing that appellate counsel provided him with ineffective assistance when he failed to argue that trial

counsel was ineffective by failing to tender IPI Criminal 4th No. 3.17 regarding accomplice testimony. It states as follows:

> "When a witness says he was involved in the commission of a crime with the defendant, the testimony of that witness is subject to suspicion and should be considered by you with caution. It should be carefully examined in light of the other evidence in the case." Illinois Pattern Jury Instructions, Criminal, No. 3.17 (4th ed. 2000).

¶ 42 "Decisions concerning defense counsel's choice of jury instructions are characterized as tactical decisions within the judgment of defense counsel." *People v. Houston*, 363 Ill. App. 3d 567, 575 (2006). "Trial strategy cannot be a basis for finding counsel ineffective." *Id.* Failure to request a particular jury instruction may be grounds for finding ineffective assistance of counsel, only if the instruction was so "critical" to the defense that its omission "den[ied] the right of the accused to a fair trial." *People v. Pegram*, 124 Ill. 2d 166, 174 (1988); *People v. Pollards*, 367 Ill. App. 3d 17, 23 (2006). Matters of trial strategy are generally immune to claims of ineffective assistance of counsel. *People v. Manning*, 241 Ill. 2d 319, 327 (2011).

¶ 43 We are instructed by defendant's prior appeal wherein he argued that counsel was ineffective for failing to impeach Trujillo with his prior inconsistent statement, contained in his police report, and failing to seek admission of that statement as substantive evidence. *Shipp*, 2015 IL App (2d) 131309, ¶ 8. On direct examination, Trujillo testified that defendant asked him why his girlfriend was charged with the same crime when she never touched "the gun." *Id.* ¶ 9. Trujillo wrote in his police report that defendant asked him why his girlfriend had been charged with the same crime when she never "even touched a handgun." *Id.* Defendant contended that Trujillo's testimony that he said that his girlfriend never touched "the gun" was much more damaging to his case than his statement contained in the written police report that she never touched "a handgun,"

because the first statement implied that he was present at the shooting and had knowledge about the weapon used in the shooting. *Id.* ¶ 10. On appeal, we determined that the practical implications of both statements were the same: "defendant knew that his girlfriend did not touch the gun used to shoot Franklin, likely because defendant was at the scene." *Id.* ¶ 11. Therefore, we determined that it was a matter of trial strategy "whether to emphasize the difference between what Trujillo said on direct examination and what he admitted on cross-examination." *Id.* We also rejected defendant's argument that counsel was ineffective for failing to seek the introduction of Trujillo's police report as substantive evidence. *Id.* ¶ 12. We reasoned that counsel's decision was a matter of trial strategy because a party "may prefer not to bring attention to his presence at a crime scene." *Id.*

¶ 44    Similarly, we determine that counsel's failure to request the accomplice jury instruction was a matter of trial strategy. Carpenter was the only witness who identified defendant as the offender. Defendant focuses only on the part of the jury instruction stating that "the testimony of that witness is subject to suspicion and should be considered by you with caution." However, the first part, states that "When a witness says [s]he was involved in the commission of a crime with the defendant." This part of the accomplice witness instruction would have undermined counsel's argument that the identity of the offender was not established. Defense counsel, reasonably, may not have wanted to call Carpenter an accomplice and bring attention to defendant's "presence at the crime scene" (*Shipp*, 2015 IL App (2d) 131309, ¶ 12)**,** thereby inviting the jury to conclude that he was the perpetrator of the crimes charged. Therefore, defendant cannot meet the first prong of *Strickland* because he cannot establish that counsel's performance was objectively unreasonable.

¶ 45    Because defendant did not establish that counsel's failure to tender the accomplice witness instruction was objectively unreasonable, we need not address his argument that he was prejudiced by counsel's failure. See *Pingelton*, 2022 IL 127680, ¶ 53 ("In order to prevail on a claim of ineffective assistance of counsel, both prongs of the *Strickland* standard must be satisfied."). In any event, even if trial counsel's failure to request IPI Criminal No. 3.17 was objectively unreasonable, its absence did not prejudice defendant and, therefore, he cannot establish ineffective assistance of counsel. "Failure to request a particular jury instruction may be grounds for finding ineffective assistance of counsel, only if the instruction was so 'critical' to the defense that its omission 'den[ied] the right of the accused to a fair trial.'" *People v. Rodriguez*, 387 Ill. App. 3d 812, 828 (2008) (quoting *People v. Pegram*, 124 Ill. 2d 166, 174 (1988)). The accomplice-witness instruction directs the jury that it should carefully consider the witness's testimony with suspicion, caution, and in light of all evidence. See *People v. Hunt*, 2016 IL App (2d) 140786, ¶ 52 ("The [purpose of the accomplice-witness instruction] is to warn the jury that the witness might have a strong motivation to provide false testimony for the State in exchange for immunity or some other lenient treatment.").

¶ 46    Here, counsel thoroughly attacked Carpenter's credibility during cross-examination and in closing argument. Even in the absence of the accomplice-witness instruction, counsel impressed upon the jury that it should view Carpenter's testimony with heightened suspicion. Counsel highlighted the inconsistencies in her testimony, her motive to lie, and her criminal background. Counsel emphasized that Carpenter's story changed numerous times and he argued to the jury that she was the only person who claimed to know who the real shooter was.

¶ 47    Further, the jury received the pattern instruction regarding general witness credibility (IPI Criminal 4th No. 1.02). While this instruction alone does not cure the failure to request the

accomplice-witness instruction (*Hunt*, 2016 IL App (2d) 140786, ¶ 60), "the fact that the jury was told to consider, in general, the bias, interest or prejudice of the witnesses may be considered as one factor, *among others*, which establishes that [the] defendant was not prejudiced by his trial counsel's failure to tender the accomplice witness instruction." (Emphasis in original.) *People v. McCallister*, 193 Ill. 2d 63, 97 (2000). Given that the jury received that instruction, coupled with all the evidence and trial counsel's thorough attack on Carpenter's credibility, there is no reasonable probability that the jury would have reached a different verdict had it also received IPI Criminal No. 3.17. Accordingly, defendant cannot meet the second prong of *Strickland*, and his claim of ineffective assistance of counsel fails regarding this issue.

¶ 48                    B. Admission of 911 Recording as Substantive Evidence

¶ 49    Defendant argues that appellate counsel was ineffective by failing to argue that the trial court erred by admitting a recording of Franklin's 911 call as substantive evidence.

¶ 50    "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Ill. R. Evid. 801(c) (eff. Oct. 15, 2015). Although hearsay is generally inadmissible (see Ill. R. Evid. 802 (eff. Jan. 1, 2011), various exceptions exist, including an exception for a statement deemed to be an excited utterance. See Ill. R. Evid. 803(2) (eff. Jan. 25, 2023). An excited utterance is defined as "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." *Id.* Therefore, as defendant acknowledges, generally, a recording of a 911 call is admissible under the excited utterance exception to the hearsay rule. *People v. Watt*, 2013, IL App (2d) 120183, ¶ 43.

¶ 51    Defendant argues that the 911 recording was inadmissible because it was a prior consistent statement that bolstered Franklin's testimony that the gunman was the sole aggressor. Defendant

relies on *People v. Gray*, 302 Ill. App. 3d 407 (1991), to support his argument. In *Gray*, the defendant's conviction of aggravated criminal sexual assault was reversed because the trial court improperly admitted the prior consistent statements of three witnesses, all of whom were told by the victim that she was "raped," because it bolstered the victim's credibility. *Gray*, 209 Ill. App. 3d at 417-18. The trial court also refused to allow the victim to be cross-examined. First, we note that *Gray* did not involve the admissibility of a 911 recording. In addition, defendant has failed to establish how the 911 recording bolstered the victim's testimony. Therefore, *Gray* is distinguishable from this case. Further, we determine that, here, when a 911 caller was being shot at and hit multiple times, the trial court did not abuse its discretion by allowing the 911 recording into evidence as an excited utterance, and, therefore, no error occurred. Accordingly, Defendant cannot establish that counsel's performance was objectively unreasonable, and, therefore, he failed to establish the first prong of *Strickland*. Therefore, defendant cannot establish that appellate counsel was ineffective by failing to argue that the trial court erred by admitting the recording of Franklin's 911 call.

¶ 52    Defendant also argues that he was prejudiced by counsel's alleged deficient performance. However, we need not address the prejudice prong of *Strickland* because defendant failed to establish that counsel's performance was objectively unreasonable. See *Pingelton*, 2022 IL 127680, ¶ 53 (to prevail on a claim of ineffective assistance of counsel, both prongs of the *Strickland* standard must be satisfied).

¶ 53    Since we have concluded that defendant's underlying issues lack merit, defendant cannot show that he was arguably prejudiced by counsel's failure to raise the claims on appeal. Accordingly, defendant's claims of ineffective assistance of appellate counsel fail and he has failed

to make a substantial showing of a constitutional violation. Therefore, the trial court properly dismissed defendant's postconviction petition.

¶ 54                                  III. CONCLUSION

¶ 55    For the reasons stated, we affirm the judgment of the circuit court of Kane County.

¶ 56    Affirmed.