2021 IL App (1st) 191146-U

No. 1-19-1146

Order filed June 24, 2021

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Respondent-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 11 CR 3750 |
| | ) | |
| SHAWN RUDOLPH, | ) | Honorable |
| | ) | Diane Cannon, |
| Petitioner-Appellant. | ) | Judge, presiding. |

JUSTICE LAMPKIN delivered the judgment of the court.
Presiding Justice Gordon and Justice Martin concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The summary dismissal of defendant's postconviction petition at the first stage of postconviction proceedings is affirmed because his claim of actual innocence, which was based on a witness's testimony that two other men carrying guns walked toward the scene of the offense shortly before the witness heard shooting, failed to state the gist of a claim since that testimony did not place the trial evidence in a different light and thus was not of such conclusive character that it would likely change the outcome on retrial.

¶ 2    Defendant Shawn Rudolph, who was convicted of first degree murder and attempted first

degree murder, appeals the circuit court's dismissal of his *pro se* postconviction petition at the first

stage of postconviction proceedings. He argues that he sufficiently pled a claim of actual innocence based on newly discovered evidence that a witness observed two other men with guns walk toward the scene of the offense shortly before the shooting commenced.

¶ 3    For the reasons that follow, we affirm the judgment of the circuit court.[1]

¶ 4                                      I. BACKGROUND

¶ 5    A more thorough summary of the facts can be found in this court's Rule 23 order, which was filed in defendant's case on direct appeal on December 22, 2017, and is posted on the Supreme Court website at www.illinoiscourts.gov. Here, we provide a brief summary tailored to the issue raised in defendant's postconviction petition.

¶ 6    This case arose from the September 2010 shooting death of Andrew Powell and the attempted shooting of Maurice McArthur. At the September 2013 trial, the State's evidence showed that on the evening in question, a fight had occurred between the members of the "S-Dub" street gang and the "crew" of a man named "Bone" from the "H Block" street gang. Shortly after the fight, S-Dub member McArthur and other S-Dub members went to a house on the 7200 Block of South Hermitage Avenue, where Powell resided.

¶ 7    Powell was on the sidewalk in front of his home while McArthur and two other males were on the front porch. McArthur heard a voice across the street say, "Yeah, n***er." McArthur observed defendant and Bone, both of whom McArthur knew, and two other males emerge from the gangway of the house across the street. Defendant and Bone came further out toward the sidewalk. They stood side by side with their guns drawn and pointed at the group in front of

---

[1] In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

Powell's house and fired their weapons. Powell was shot and fell to the ground, but McArthur and his associates fled to safety. McArthur heard about 16 gunshots and saw defendant and Bone run back through the gangway from which they had emerged. The two other offenders had already fled back through that gangway before defendant and Bone.

¶ 8      Shortly before the shooting, Powell's cousin, Quenita Johnson, was walking toward the home she shared with Powell. She walked down the middle of the street for safety reasons. When she was about 3 1/2 car lengths from home, she noticed Powell and McArthur and his two associates. Then Johnson noticed "approximately" two people emerge from the gangway of the house across the street. She recognized defendant, whom she had known for at least five years from having purchased marijuana from him. She saw defendant and the other person raise their arms and fire guns at the group on the porch of her home.

¶ 9      Powell's sister, Desiree Reed, was sitting on a sofa inside the house at the time of the shooting. The back of the sofa was against the front window. When Reed heard gunshots, she looked out the window behind her and saw "[l]ike three" people including defendant, whom she knew, standing across the street and firing a gun at her house. Her friend Courtney Taylor pulled her from the sofa to the floor. Reed heard a total of about 6 to 10 gunshots. She ran out the backdoor and to a friend's house. Taylor testified that he dove to the floor when the gunshots started. Then he pulled Reed, who was balled up on the sofa, down to the floor. Taylor did not see Reed look out the window.

¶ 10      When the police arrived at the scene, McArthur spoke to them but gave a false surname. He also falsely stated that the four people in the gangway all wore hoodies and he did not see their faces. McArthur lied about his name and what he saw because he was affiliated with a street gang

at that time and worried about retaliation for being a snitch. In February 2011, McArthur initially repeated those lies when he first spoke with an assistant State's Attorney (ASA) but then decided to truthfully disclose what he witnessed because he believed that it was wrong to withhold that information and he wanted justice for Powell's family. Furthermore, McArthur was no longer worried about retaliation because he was not in a street gang and knew that defendant had been arrested. McArthur identified defendant and Bone from photo arrays and, in March 2011, identified Bone from a lineup.

¶ 11     Johnson testified that the scene was chaotic after the shooting and she and several family members followed the ambulance that transported Powell to the hospital. The family remained at the hospital, and Powell was pronounced dead the next day at about 1:20 p.m. After the grieving family returned home, a detective came to the house to investigate the shooting. Johnson described defendant to the detective as a light-skinned African American male, who was about 5'9" tall, with a cornrow hairstyle and multiple tattoos on his neck. She explained that she did not know his name but knew him from having purchased marijuana from him in the past. Later that evening, Johnson identified defendant from a photo array as the offender who fired gunshots at her home. After defendant's February 2011 arrest, Johnson identified him as the shooter from a lineup. In March 2011, she viewed another lineup and recognized Bone as someone from whom she had purchased marijuana and an associate of defendant; however, Johnson did not identify Bone as someone she saw on the night of the shooting.

¶ 12     Reed testified that when she spoke to police at the scene shortly after the shooting, she falsely told them that she did not see who did the shooting because she was afraid of retaliation. When detectives came to her home in February 2011 to take Johnson to view a lineup, Reed felt

that she needed to do the right thing, so she told the detectives that she saw defendant fire gunshots at her home. Thereafter, she identified defendant from a lineup as the offender who shot her brother. When she viewed another lineup in March 2011, she recognized Bone, whom she knew from being on a street near her home; however, she did not identify Bone as being one of the offenders.

¶ 13    The jury found defendant guilty of first degree murder and attempted first degree murder.

¶ 14    Shortly thereafter, defense counsel informed the court that defendant had received a letter wherein McArthur recanted his testimony. The ASA, however, stated that McArthur told the ASA that people associated with defendant were threatening him. At the hearing of defendant's posttrial motion, McArthur testified and denied writing the aforementioned letter. McArthur explained that his brother wrote that later based on their conversation wherein McArthur said he did not see the faces of the shooters. McArthur testified that he lied under oath when he testified at the September 2013 trial that he saw the shooters' faces and one of them was defendant. According to McArthur, the police had pressured him by repeatedly stating that someone had said McArthur saw a face, so McArthur "went off what the neighborhood was saying" and falsely claimed that he saw defendant's face. McArthur said that Powell's family also pressured him somewhat to ensure that somebody got convicted for the crime.

¶ 15    The trial court stopped the hearing, struck McArthur's posttrial hearing testimony, and appointed counsel to represent him. Thereafter, McArthur indicated that he was invoking his fifth amendment right and declined to answer further questions.

¶ 16    When the posttrial motion hearing resumed in January 2015, the trial court determined that McArthur could not assert a fifth amendment right under the circumstances. McArthur testified

that his September 2013 trial testimony was true but his testimony at the posttrial motion hearing—that he did not see the shooters' faces—was false. McArthur testified that he did see the shooters' faces and defendant and Bone were the shooters. McArthur acknowledged that he told the ASA after the trial that he lied about seeing the shooters' faces. However, McArthur's picture had been posted on an Instagram account with comments criticizing him for snitching on defendant. McArthur testified that his brother, on his own initiative, wrote the letter to defendant due to the threats McArthur's "people" were receiving.

¶ 17    McArthur also admitted that he wrote a letter in February 2014 to Tynicka Hart, the mother of his children, wherein McArthur indicated that his identification testimony at the trial was a lie. However, McArthur testified that he was being threatened and "made up the letter" so that Tynicka could tell her friends about it because McArthur knew that "her friends hang with [the people who threatened McArthur]." Also, McArthur stated that his sisters had received threats from defendant's friends about being shot.

¶ 18    The trial court denied defendant's motion for a new trial and sentenced him to consecutive prison terms of 45 years for first degree murder and 15 years for attempted first degree murder. This court affirmed defendant's convictions on direct appeal. *People v. Rudolph*, 2017 IL App (1st) 150399-U.

¶ 19    In February 2019, defendant filed the *pro se* postconviction petition at issue in this appeal. Relevant to this appeal, defendant alleged a claim of actual innocence. In his affidavit, defendant averred that he had sold marijuana near 71st and Honore Streets in the early 2000s but never sold it to Johnson or Reed. Defendant chose not to testify at his trial because he thought that the jury would not believe the State's witnesses and would hold defendant's drug dealing against him.

He also worried about being prosecuted for selling and distributing marijuana. He was not surprised when McArthur eventually testified against him because McArthur sent word to him early in the case that Johnson told McArthur she had heard that defendant was responsible for the murder and she asked McArthur to name defendant as the shooter. Then McArthur approached defendant for a favor and asked defendant to either set him up with defendant's marijuana supplier or give him $2500 so he could buy a "big enough piece to set himself up selling drugs." McArthur also told defendant that Johnson insisted on blaming defendant for the shooting, and he should help the people who were helping him. Defendant told McArthur that he did not need any help.

¶ 20    Defendant also included the February 7, 2019 affidavit of Anthony Jones, who averred that near midnight on September 30, 2010, he was walking toward 72nd and Honore Streets, where he usually bought marijuana from either defendant or Lil Donald. He encountered Lil Donald and another black male near 72nd and Wood Streets. Jones did not know the other man. They had guns in their hands and told Jones that "the weed spot was shut down for the day" and he should get inside a house because the area was about to get "hot." As Jones left the area, Lil Donald and the other man turned toward the 7200 block of South Hermitage Avenue. As Jones was passing the alley near Hermitage Avenue, he heard gunshots and ran. The next day, Jones heard people in the neighborhood say that a young boy was killed and defendant was responsible. Jones did not think defendant was responsible. One week later, Jones encountered Lil Donald, who asked Jones if he remembered seeing or talking to him on the night of September 30, 2010, or if Jones had heard anything. Jones responded that he did not know what Lil Donald was talking about. Lil Donald said that was why he liked Jones, gave him a free bag of marijuana worth $20 and said, "snitches go to the grave." Jones did not come forward with this information before because he did not want

to bring harm upon his family of himself; however, he had recently committed his life to God and wanted to do the right thing.

¶ 21 On April 17, 2019, the circuit court summarily dismissed defendant's petition as frivolous and patently without merit. Defendant timely appealed.

¶ 22                                    II. ANALYSIS

¶ 23 Defendant argues the circuit court erroneously dismissed his *pro se* petition at the first stage of postconviction proceedings because he sufficiently alleged the gist of a claim of actual innocence based on the affidavit of Jones, which constitutes newly discovered, material, non-cumulative evidence that is likely to change the outcome on retrial.

¶ 24 "The Act provides a method by which persons under criminal sentence in this state can assert that their convictions were the result of a substantial denial of their rights under the United States Constitution or the Illinois Constitution or both." *People v. Hodges*, 234 Ill. 2d 1, 9 (2009). Proceedings under the Act are divided into three stages. *Id*. at 10. At the first stage, the defendant must set forth only the gist of a constitutional claim. *Id*. at 9. The circuit court conducts a threshold evaluation of the allegations in the petition and should only dismiss it if a defendant's claims are frivolous or patently without merit, which generally means that the claims have "no arguable basis either in law or in fact." *People v. Boykins*, 2017 IL 121365, ¶ 9. "At this stage, the circuit court is not permitted to engage in any fact-finding or credibility determinations, as all well-pleaded facts that are not positively rebutted by the original trial record are to be taken as true." *People v. Scott*, 2011 IL App (1st) 100122, ¶ 23. Circuit courts must give *pro se* petitions "a liberal construction" at the first stage, and review them "with a lenient eye, allowing borderline cases to proceed." (Internal quotations and citation omitted.) *Hodges*, 234 Ill. 2d at 16-17. We review the circuit

court's summary dismissal of a postconviction petition *de novo*. *People v. Tate*, 2012 IL 112214, ¶ 10; see also *People v. Tyler*, 2015 IL App (1st) 123470, ¶ 151 (*de novo* review means that the reviewing court performs the same analysis the trial court would perform).

¶ 25    "The due process clause of the Illinois Constitution affords postconviction petitioners the right to assert a freestanding claim of actual innocence based on newly discovered evidence." *People v. Ortiz*, 235 Ill. 2d 319, 333 (2009).

"To establish a claim of actual innocence, the supporting evidence must be (1) newly discovered, (2) material and not cumulative, and (3) of such conclusive character that it would probably change the result on retrial. [Citations.] Newly discovered evidence is evidence that was discovered after trial and that the petitioner could not have discovered earlier through the exercise of due diligence. [Citation.] Evidence is material if it is relevant and probative of the petitioner's innocence. [Citation.] Noncumulative evidence adds to the information that the fact finder heard at trial. [Citation.] Lastly, the conclusive character element refers to evidence that, when considered along with the trial evidence, would probably lead to a different result. [Citation.] The conclusive character of the new evidence is the most important element of an actual innocence claim. [Citation.]

Ultimately, the question is whether the evidence supporting the postconviction petition places the trial evidence in a different light and undermines the court's confidence in the judgment of guilty. [Citation.] The new evidence need not be entirely dispositive to be likely to alter the result on retrial. [Citation.] Probability, rather than certainty, is the key in considering whether the fact finder

would reach a different result after considering the prior evidence along with the new evidence." *People v. Robinson*, 2020 IL 123849, ¶¶ 47-48.

¶ 26    In his affidavit, defendant averred that, early in the case, McArthur sent word or informed him that Johnson (1) merely heard talk in the neighborhood that defendant was the shooter, and (2) asked McArthur to corroborate her false testimony that she observed defendant shoot at the group on the porch. Defendant also averred that McArthur attempted to extort him in exchange for rejecting Johnson's request to testify against him. Assuming the truth of these claims, they do not constitute newly discovered evidence because defendant conceded that he learned this information before his trial.

¶ 27    Defendant also supported his actual innocence claim with Jones's affidavit. First, we assume the truth of Jones's claim that Lil Donald and an unknown black male warned him to get inside because the area was about to get "hot"; Jones observed them carrying guns as they walked toward the scene of the offense; then Jones heard gunfire at the scene and fled; and Jones failed to timely disclose this information due to his fear of retaliation. This evidence is newly discovered because defendant presumably did not know about Jones's relevant and noncumulative testimony prior to the trial since Jones feared retaliation and did not come forward with this information until recently. Jones's testimony, however, is not of such a conclusive character that it would probably change the result on retrial.

¶ 28    Jones did not witness the shooting and the State presented the testimony of three eyewitness who knew defendant prior to the shooting and clearly identified him as an offender who shot at the group on the porch. Furthermore, Jones's testimony does not impeach or contradict the eyewitnesses' testimony that defendant was part of a group of offenders. Although Johnson, Reed

and McArthur testified, respectively, about seeing "approximately two," "like three," or four offenders, that difference in their testimony was not unusual based on their view of the crime scene at the time of the shooting.

¶ 29 McArthur was on the porch directly across the street from the gangway out of which the four offenders emerged. Furthermore, his attention was drawn to the group of offenders before the shooting started because one of offenders yelled an insult at McArthur's group. From his vantage point, McArthur could see two offenders in the gangway in addition to defendant and Bone, who had positioned themselves further out of the gangway and closer to the sidewalk. Johnson, however, was in the middle of the street and more than three car lengths away from defendant and Bone. Consequently, Johnson's view of the gangway was at an angle that could have concealed the existence of the additional offenders in the gangway. Furthermore, because the offenders in the gangway fled from view before defendant and Bone fled the scene, Reed would not have seen all four offenders when she looked out the window after the shooting started. The State also presented evidence of a motive for the shooting based on a fight between street gangs that had occurred shortly before the offense.

¶ 30 Defendant's reliance on *Robinson* to support the sufficiency of his petition is misplaced. In *Robinson*, an affiant averred that he had observed the shooting, defendant Robinson's face was not one of the faces he saw, and one person the affiant observed at the scene was someone who confessed to the murder to another affiant. 2020 IL 123849, ¶ 65. The other affiants averred that they saw other people, including the person who confessed to the murder, before and after the crime disposing of the weapon and preparing to burn the body. They also averred that Robinson was not with those other people, contrary to the evidence presented at the trial. *Id.* at ¶¶ 67-81.

The court held that this evidence was of such a conclusive character as to probably change the outcome of the trial, considering that "no physical or forensic evidence linked the defendant to the crimes, and no eyewitnesses identified him as being involved or even present at the time of the relevant events. *Id*. at ¶ 80. Unlike *Robinson*, here the State presented three eyewitnesses who identified defendant, their known local drug dealer with the distinctive neck tattoos, as one of the shooters among a group of multiple offenders.

¶ 31    Jones's affidavit does not significantly advance defendant's claim of actual innocence by placing the trial evidence in a different light and undermining the court's confidence in the judgment of guilt. Consequently, this new evidence does not raise the probability that it is more likely than not that no reasonable juror would have convicted defendant. Accordingly, we find that defendant failed to state the gist of an actual innocence claim and the trial court properly dismissed his petition at the first stage of the postconviction proceeding.

¶ 32                                III. CONCLUSION

¶ 33    For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 34    Affirmed.