2025 IL App (1st) 231592-U

No. 1-23-1592

Order filed August 25, 2025

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 11 CR 12310 |
| | ) | |
| GREGORY LUELLEN, | ) | Honorable |
| | ) | James B. Linn, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE PUCINSKI delivered the judgment of the court.
Justices Lavin and Cobbs concurred in the judgment.

**ORDER**

¶ 1    *Held*: We affirm the order of the circuit court dismissing defendant's amended postconviction petition alleging actual innocence when the evidence attached was not so conclusive as to probably change the result at trial.

¶ 2    Defendant Gregory Luellen appeals from the circuit court's order granting the State's motion to dismiss his petition for relief under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq*. (West 2024)) at the second stage. On appeal, defendant contends that his petition

made a substantial showing of actual innocence and the circuit court erred in dismissing the petition. We affirm.

¶ 3    Defendant was charged with first degree murder in connection with the shooting death of David Cardine on July 1, 2011. The evidence at trial was set forth in our opinion on direct appeal. *People v. Luellen*, 2015 IL App (1st) 130080-U, ¶¶ 10-60. We summarize the evidence relevant to this appeal.

¶ 4    At trial, the State presented evidence that Cardine was 21 years old on July 1, 2011. According to the medical examiner, the cause of death was a gunshot wound to the head and the manner of death was homicide.

¶ 5    Christine Montgomery and Darius Herns testified that they were at the Cardine family home on the 1400 block of South St. Louis Avenue in Chicago on July 1, 2011. At around 2 p.m., they observed James Carter, Cardine's uncle, argue with defendant in front of the house. Montgomery and Herns knew defendant from the neighborhood. They saw defendant remove a small, silver firearm from his pocket and poke Carter with it. Cardine positioned himself between defendant and Carter to separate them. Cardine, Carter, and Cardine's girlfriend Ashley Brooks then walked to Cardine's white van, which was parked on St. Louis in front of the house, and drove away. Montgomery and Herns observed defendant enter his gray van and drive in the same direction as Cardine's van.

¶ 6    Brooks testified that, at approximately 1:55 p.m. on July 1, 2011, she and Cardine returned to the Cardine home after shopping. Cardine was driving a white van with red lettering that he used for work. Cardine parked the van on St. Louis and entered the house, while Brooks remained in the van in the front passenger's seat. Brooks observed defendant, with whom she was familiar, poke Carter with a silver firearm. After Cardine broke up the altercation, Brooks yelled from the

van, "come on, let's go," and she opened the driver's door. Cardine entered the driver's seat while Carter sat in a chair behind them.

¶ 7    Cardine turned left on 15th Street, left on Homan Avenue, then left on Douglas Boulevard. As Douglas turned into Independence Boulevard, Carter stated, "[t]he van is following us." Brooks looked in the rearview mirror and observed defendant's van swerve behind them. Cardine stopped at a stop sign at 13th Street and Independence, even though Brooks told him to keep going. Defendant pulled up on the driver's side and Brooks looked at him. Both Cardine's driver's side window and defendant's passenger's side window were down. Defendant pointed the silver firearm at Cardine. Defendant shot the firearm and Brooks heard "a couple of noises." Cardine released the steering wheel, leaned to the right, and was bleeding from his head.

¶ 8    Carter testified that he was at the Cardine home at around 2 p.m. on July 1, 2011. He saw defendant and a few men approach the front of the house. Defendant argued with Carter about Carter's nieces and nephews, then reached into his right pocket, retrieved a firearm, and poked Carter in the left side with it. Cardine walked down the steps, grabbed Carter's shirt and pushed him back, and tried to place himself between Carter and defendant. Cardine told Carter to "ride with him" and they entered the white van, where Carter sat in the back.

¶ 9    While they drove, Carter recognized the sound of defendant's van and observed the van in the driver's side mirror. The van swerved towards the passenger side and then the driver's side. When Cardine stopped at a stop sign, defendant's van came alongside the driver's side and Carter told Cardine "to pull off." Carter heard a "pop" and observed Cardine's head move to the right and his hand slip from the steering wheel. Carter grabbed the steering wheel and observed defendant holding the same firearm he earlier used to poke Carter. Defendant turned right onto Roosevelt Road. Carter stayed with Cardine and, when the police arrived, he told them who shot Cardine.

Carter did not know defendant by name, so he directed police to defendant's sister's home. Carter was taken to the police station and identified a photograph of defendant as the shooter.

¶ 10    Chicago police detective Thomas Crain testified that he and his partner investigated the shooting. Two Chicago police pod cameras and two surveillance cameras from private businesses showed footage near the scene of the shooting. Footage from the pod camera at Independence and Roosevelt showed a gray 1991 Chevrolet conversion van matching the description of defendant's van turn east onto Roosevelt around the time of the shooting. Defendant surrendered himself to the police on July 2, 2011. Crain brought Carter, Brooks, Montgomery, and Herns into the police station to view a live lineup, and all of them identified defendant.

¶ 11    Chicago Police Department forensic investigator Paul Presnell testified that he went to the pound where defendant's van was secured on July 6, 2011. Presnell collected gunshot residue test samples from the interior, including the driver's and front passenger's headliners and seat covers. Illinois State Police trace evidence analyst Robert Berk testified that he tested the gunshot residue samples. All the samples tested positive for primer gunshot residue. The pattern of residue was consistent with the driver of the van pointing a firearm toward the passenger side and shooting from the passenger window.

¶ 12    The defense called William Walton, who testified that on July 1, 2011, at approximately 2:30 p.m., he was leaving a gas station on the west side of the intersection of Independence and Roosevelt. He noticed a white van and a gold, four-door older model vehicle close to each other on Independence. The passenger in the front seat of the gold vehicle "had his hand stuck out pointing into the van." Walton did not see a firearm in the passenger's hand, but he heard a sound like firecrackers five or six times. The gold vehicle then "took off," nearly hitting a child and

running a red light at Roosevelt. The white van swerved and ultimately came to a stop. The driver of the van had been shot and was covered with blood.

¶ 13     Walton testified that he did not see a gray van at the intersection. He reviewed footage from a surveillance camera that showed Independence around the time of the shooting and acknowledged that a gray van passed by in the video, but he testified that the van "was not out there when I was out there." He further testified that the video showed a four-door gold vehicle pass by, but stated that it was not the same gold vehicle that he had seen that day. In the surveillance video, he could not point out the gold vehicle that he saw during the incident.

¶ 14     Defendant's cousin, John Hall, testified that he was with defendant during the argument with Carter on July 1, 2011. Carter became angry and was yelling, but defendant just wanted to see what the problem was. Hall did not see defendant with a weapon at any time. Carter entered a white van with red lettering with another man and a woman. Once the white van drove away, defendant walked to his sister's home down the block and told her to go inside and call the police if anything happened. Defendant left five or six minutes after the white van departed.

¶ 15     Chimera McGee, defendant's fiancé, testified that at the time of the shooting, defendant lived with her on the 2200 block of South Keeler Avenue in Chicago. He owned a Chevrolet van that he usually parked behind their home. McGee was last in the van on June 30, 2011. At that time, all of the windows worked properly except the front passenger's side window. The window was controlled with a power switch, but it would not work when pressed.

¶ 16     Defendant testified that he received a telephone call from his sister Wanda Luellen on the evening of June 30, 2011. She informed him that "her neighbors were giving her a problem," referring to Carter, and asked defendant to come by her house on St. Louis. Defendant went to her house the next day around 2:15 p.m. He parked along St. Louis, and observed Carter exiting the

Cardine home. Defendant asked Carter what happened the previous night, and Carter said, "get the F on with that BS." Carter, who appeared to be high on drugs, became angry and started to yell. Defendant yelled back. He acknowledged arguing with Carter, but denied pointing a firearm at Carter or being in possession of a firearm.

¶ 17    Carter broke off the conversation and entered the white van with Brooks and Cardine. Carter told defendant, "don't be standing there when he get back." Defendant interpreted this to be a threat and responded "[t]hat I was going to knock crack out of him." Defendant denied that this statement meant he planned to kill Carter. The white van drove away and defendant instructed his family to go in the house and call him or the police if needed.

¶ 18    Defendant then drove toward the office of his automobile insurance provider to renew his insurance. He left approximately 10 minutes after the white van. Defendant turned left onto 15th, left onto Homan, and then left on Douglas. He encountered the white van when it swerved at him and tried to cut him off near Central Park Avenue and Douglas. Defendant passed the van where Douglas turned into Independence, but he slowed as he approached a stop sign at Independence and 13th. When the white van caught up with defendant, he observed a firearm "coming around the driver's chest" and pointed at him. He could not see who was holding the firearm, but it was not the driver. Defendant accelerated away from the intersection. His van's muffler and speaker system were both loud, so he did not hear whether any gunshots were fired from the white van, and he drove too fast to see if any shots were fired. Instead of going to pay his insurance, defendant returned home.

¶ 19    Defendant denied having a firearm in his van on July 1, 2011, or pointing a firearm at the white van. Defendant denied shooting a firearm inside his van, and he was unaware of anyone else ever doing so. His van was a 1991 Chevrolet G20 conversion van, and he performed all the

mechanical work on it. The motor for the front passenger window was not working on July 1, 2011.

¶ 20  The jury found defendant guilty of first degree murder. Defendant was sentenced to 20 years' imprisonment and an additional 25-year enhancement for personally discharging a firearm causing death.

¶ 21  On direct appeal, defendant argued that his federal and state due process rights were violated when the Chicago Police Department auctioned his van less than three months after his arrest. *Luellen*, 2015 IL App (1st) 130080-U, ¶¶ 63, 77. This court affirmed, finding that he forfeited his federal due process claim, he failed to show that his state due process rights were violated, and the trial court did not abuse its discretion in refusing to exclude gunshot residue evidence recovered from the van or to give defendant's requested non-pattern jury instruction regarding the disposal of his van. *Id.* ¶¶ 66, 81, 92, 99, 104.

¶ 22  Defendant filed a *pro se* postconviction petition on December 29, 2016. Defendant raised two claims: (1) an actual innocence claim, based on affidavits from Rose Crawford and Krystal Jackson, and (2) a claim that trial counsel was ineffective for failing to call an expert on gunshot residue to support his explanation for the presence of gunshot residue in his van.

¶ 23  Crawford's affidavit, dated November 7, 2016, stated that on July 1, 2011, she visited a friend on 13th and Independence. As she exited a vehicle, a shooting occurred and she observed "[a] young man running west on 13th street toward Pulaski with a gun in his hand." He wore a black hoodie, blue jeans, and white gym shoes. Crawford could not see his face because he wore his hood. Since the shooting, Crawford's friend moved and Crawford did not return to the area "because of fear." A few years later, she went to a clinic in the neighborhood and spoke with a "young lady" about the 2011 incident. The woman stated that her fiancé was incarcerated for what

occurred. The woman showed Crawford a photograph of her fiancé, "a large man," but the individual Crawford saw on July 1, 2011, was "thin and very fast." Crawford believed that "the wrong man [was] in custody for that shooting."

¶ 24    Jackson's affidavit, dated November 23, 2016, stated that on July 1, 2011, she visited a family member and "heard an altercation between 2 guys." Later, "this gentleman was running west on 13th Street towards Pulaski with a gun that was visible." Jackson did not see the man's face, but he wore a dark jacket with jeans and white shoes. A few seconds later, Jackson heard gunshots and observed a gold vehicle leaving and another vehicle stopped. Jackson believed that "the person that was murdered was in the second vehicle." The man who had been running with the firearm "disappeared once that gold car drove off."

¶ 25    One Sunday, Jackson attended church and observed a woman "looking for the pastor to see if he could tell what he saw the day that this crime took place." Jackson told the woman what Jackson observed and that she did not previously come forward because she was afraid. The woman showed Jackson a photograph of a "short and round" individual, but the man whom Jackson had observed running was "slender." Jackson averred that "the guy that was seen running committed this crime and possibly got in a car and drove off." According to Jackson, "[t]he man *** locked up is definitely not the right guy."

¶ 26    At a hearing on defendant's petition on January 9, 2017, the circuit court observed that the affidavits lacked specific information about the crime, and dismissed the petition without prejudice. Defendant appealed. We allowed the parties' agreed motion to dismiss the appeal, as the circuit court's order was not final and appealable. *People v. Luellen*, No. 1-17-0462 (2018) (unpublished summary order under Illinois Supreme Court Rule 23(c)).

¶ 27    On January 11, 2019, the circuit court stated that it had not received any new affidavits to support defendant's actual innocence claim, and that defendant's ineffective assistance claim lacked merit. The circuit court summarily dismissed the petition. Defendant again appealed. We granted the parties' agreed motion for a summary disposition, as the circuit court failed to rule on or dismiss the petition within 90 days, vacated the judgment dismissing the petition, and remanded for second stage postconviction proceedings with appointed counsel. *People v. Luellen*, No. 1-19-0405 (2019) (unpublished summary order under Illinois Supreme Court Rule 23(c)).

¶ 28    On remand, defendant was originally represented by appointed counsel, but then retained private counsel. On November 14, 2022, counsel filed an amended petition for postconviction relief. The amended petition raised three claims, including an actual innocence claim based on the affidavits of Crawford and Jackson.

¶ 29    On June 27, 2023, the State filed a motion to dismiss defendant's amended petition. Relevant to this appeal, the State argued that Crawford's and Jackson's affidavits were insufficient to support an actual innocence claim, as neither affiant saw the shooting, neither identified the person they saw running as the shooter, and their affidavits did not contradict the evidence at trial that defendant was the shooter.

¶ 30    On August 28, 2023, after arguments, the circuit court issued an oral ruling granting the motion to dismiss. The court found that the affidavits from Crawford and Jackson did not establish defendant's innocence, but only that they saw an individual, who had a firearm and a different build than defendant, running from the scene. The court found such evidence unlikely to change the result at trial.

¶ 31    On appeal, defendant argues that the circuit court erred in dismissing his petition when he made a substantial showing of actual innocence based on the affidavits of Crawford and Jackson,

which, he asserts, show that another individual shot Cardine. The State argues that neither Crawford nor Jackson attested to observing a different shooter kill Cardine, so the affidavits were not so conclusive as to change the result at trial.

¶ 32    The Act allows a defendant to collaterally attack a conviction by asserting that it resulted from a "substantial denial" of his or her constitutional rights. 725 ILCS 5/122-1(a)(1) (West 2024). A postconviction petition is not an appeal from the conviction, but a collateral attack on the trial court proceedings. *People v. Tate*, 2012 IL 112214 ¶ 8. At the second stage of postconviction proceedings, the issue is whether the allegations in the petition and any attached exhibits, taken as true, set forth a substantial showing of a constitutional violation and would entitle the petitioner to relief if proven. *People v. Sanders*, 2016 IL 118123, ¶ 31; *People v. Domagala*, 2013 IL 113688, ¶¶ 33-35. The dismissal of a postconviction petition at the second stage is reviewed *de novo*. *Sanders*, 2016 IL 118123, ¶ 31.

¶ 33    "[A] freestanding claim of actual innocence is one in which the newly discovered evidence makes a persuasive showing that the petitioner did not commit the charged offense and was, therefore, wrongfully convicted." *People v. Prante*, 2023 IL 127241, ¶ 73. To warrant a third stage evidentiary hearing, a defendant "must make a substantial showing of actual innocence." *People v. Robinson*, 2020 IL 123849, ¶ 43. The defendant must produce evidence that is (1) newly discovered, meaning that it was discovered after trial and could not have been discovered earlier through due diligence; (2) material and not cumulative, meaning it is relevant and probative of the defendant's innocence; and (3) is of such a conclusive character that it would probably change the result on retrial. *Id.* ¶ 47.

¶ 34 The State does not contest that the affidavits of Crawford and Jackson are newly discovered, material, and not cumulative, but argues that the affidavits are not so conclusive that they would probably change the result at trial.

¶ 35 To be conclusive, the new evidence must place the evidence at trial in a different light and undermine the court's confidence in the defendant's guilt. *Id*. ¶ 56. New evidence is conclusive when, after considering it along with the trial evidence, a different result probably would occur. *Id*. ¶ 47. "Probability, rather than certainty, is the key in considering whether the fact finder would reach a different result after considering the prior evidence along with the new evidence." *Id*. ¶ 48. "[R]ecognizing the existence of a conflict with the trial evidence is not the same as finding that the new evidence is positively rebutted." *Id*. ¶ 60.

¶ 36 At trial, four witnesses testified about an altercation between defendant and Carter, with defendant brandishing a weapon, that occurred minutes before the shooting. Two witnesses who were familiar with defendant identified him as the individual who shot Cardine. Both Brooks and Carter witnessed defendant holding the same weapon from earlier as he shot Cardine. Gunshot residue was recovered from defendant's van in a pattern consistent with Brooks' and Carter's account of the shooting. Defendant admitted he was at 13th and Independence, though he asserted that someone in Cardine's van pointed a weapon at him and he drove away. Walton, on the other hand, testified that Cardine was shot by an individual in the front passenger's seat of a gold vehicle, and that he never recalled seeing a gray conversion van such as the one driven by defendant.

¶ 37 Defendant argues that the circuit court erred in dismissing his postconviction petition because the affidavits from Crawford and Jackson establish that the individual whom they observed was the shooter, and this evidence, taken as true, is likely to change the result at trial. Neither affiant, however, stated that she witnessed the shooting. Crawford's affidavit states a

shooting occurred and she observed a man running west on 13th with a firearm. Jackson's affidavit states that she saw a man running with a firearm, then there were shots, after which she saw a gold vehicle drive away and a man in a van, presumably Cardine, who had been shot. Crawford and Jackson each averred that the running man they saw had a different build than defendant.

¶ 38    Taken as true, the affidavits set forth evidence that an unidentified individual with a different build than defendant was present on foot with a firearm at the intersection of 13th and Independence around the time of the shooting. Jackson's affidavit also corroborates Walton's testimony at trial that a gold vehicle was present around the time of the shooting. Neither affidavit, however, establishes that the running man with the firearm was involved in the shooting of Cardine, let alone that he, not defendant, was the shooter.

¶ 39    In arguing that the affidavits of Crawford and Jackson provide conclusive evidence of his innocence, defendant relies on *Robinson*. In *Robinson*, the defendant attached four affidavits to his successive postconviction petition, two of which came from individuals who were present at the time of the crime. *Id.* ¶¶ 24-29. All four affiants stated that the defendant was not present when the crime occurred. *Id.* At trial, the defendant was convicted based on his own inculpatory statement, as no witnesses and no physical or forensic evidence placed him at the scene. *Id.* ¶¶ 15-16. Our supreme court reversed the denial of the defendant's motion for leave to file a successive postconviction petition, finding that the affidavits, taken as true, provided conclusive evidence that refuted the State's evidence at trial and exculpated the defendant from any involvement in the crime. *Id.* ¶ 83.

¶ 40    The present case is distinguishable from *Robinson*. The affidavits of Crawford and Jackson do not contradict the evidence of defendant's guilt at trial or undermine confidence in defendant's guilt. Neither affiant witnessed the shooting, saw someone other than defendant shoot Cardine, or

provided any observations that are inconsistent with defendant's guilt. Considered with the evidence of defendant's guilt at trial, which included the detailed account of the shooting from two witnesses who were familiar with defendant, we cannot say that the new evidence would likely have changed the result at trial. See *People v. Garcia*, 2022 IL App (1st) 210040, ¶ 36 (distinguishing *Robinson* and finding affidavit was not conclusive when affiant did not see the beginning or end of the altercation, and "therefore could not contradict the testimony of the State witnesses who saw defendant attack [the victim]"); *People v. Rudolph*, 2021 IL App (1st) 191146-U, ¶¶ 27-30 (distinguishing *Robinson* and finding that affidavit describing an unknown man walking towards the scene with a firearm was not conclusive when three eyewitnesses identified the defendant as the shooter).

¶ 41   While both affiants assert that defendant is the "wrong man," that is not, by itself, sufficient to warrant an evidentiary hearing. See *People v. Rissley*, 206 Ill. 2d 403, 412 (2003) ("[N]onfactual and nonspecific assertions which merely amount to conclusions are not sufficient to require a hearing under the Act."). Consequently, the evidence in the affidavits of Crawford and Jackson is not so conclusive as to probably change the result at trial. Therefore, we affirm the circuit court's second stage dismissal of defendant's amended postconviction petition.

¶ 42   Affirmed.